**Greta FAIRBROTHER, Plaintiff**

v.

**State of CONNECTICUT, DEPART-MENT OF MENTAL HEALTH AND ADDICTION SERVICES, Defendant**

**No. 3:01–CV–162(EBB).**

United States District Court,
D. Connecticut.

Oct. 29, 2003.

Jonathan Abels, West Hartford, CT, for Plaintiff.

Joseph A. Jordano, Attorney General's Office, Hartford, CT, for Defendant.

Joanne S. Faulkner, Law Offices of Joanne Faulkner, New Haven, CT, for Material Witness.

### RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

ELLEN B. BURNS, Senior District Judge.

### INTRODUCTION

Plaintiff, Greta Fairbrother ("Fairbrother"), filed this action, alleging that she was

subject to a sexually hostile work environment under Title VII and, also under that statute, retaliation for the filing of CHRO Complaints against her employer, the State of Connecticut, Department of Mental Health and Addiction Services ("DMHAS"), specifically, Whiting Forensic Institute ("Whiting").

A four-day trial was held from March 12 through March 17, 2003. On March 17, 2003, the jury returned a verdict in favor of Fairbrother. She was awarded $20,000.00 in damages.

DHMAS has filed a timely Motion for Judgment as a Matter of Law or a New Trial, which Motion is now ready for decision.

### STATEMENT OF RELEVANT BACKGROUND FACTS

The Court sets forth only those relevant background facts believed necessary to a full understanding of this litigation. This overview sets forth the full scenery with *de minimus* trial citation, although every fact herein was a part of the trial. Additional facts, with full citation, are to be found woven within the legal analysis of DMHAS' Motion.

Fairbrother transferred to Whiting from Connecticut Valley Hospital in March, 1996. Whiting is a hospital for the criminally insane, with most patients being transferred there from prison. The patients are dangerous to themselves and to others. As Lead Forensic Treatment Specialist ("FTS") on Unit One, William Boisvert ("Boisvert"), described Whiting: "Usually the patients are highly assaultive, suicidal, very suicidal. We usually get the people that Corrections can't handle. They've decompensated during prison terms or suggested suicide; very dangerous people. We're the last step on the list from the mental health system". Trial Testimony ("TT") of Boisvert, Vol. 2. 62:12–17. For this reason, trust and teamwork is "absolutely" critical. *Id.* 62:20. Each person who testified spoke of this critical need for trust amongst the entire staff on any unit at Whiting, including, in emphatic terms, Fairbrother.

When Fairbrother first transferred to Whiting she was assigned to Unit Five, third shift, as an FTS. There are six units at Whiting, and three different shifts. An FTS is responsible for the care and treatment of the criminally insane and for the maintenance of a safe and healthy environment for both the patients and the staff.

Fairbrother transferred to Unit One in the early part of 1999, at which time the nurse supervisors were Angela Kerin ("Kerin") and Al Davis ("Davis"), and her immediate supervisor was Boisvert. Tammi Brown ("Brown") became the staff nurse on Unit One in or about December, 1999.

Fairbrother alleged that, in or about, September, 1999, Boisvert and the majority of the male staff began to treat her with hostility. Specifically, at a much later date, she identified, along with Boisvert, Jacques Ouimette ("Ouimette"), James Young ("Young"), Chris Colavito ("Colavito"), and Ronald Jursch ("Jursch"). In contrast, she made no complaint as to her "best friend", her "rock", the one "who always took [her] side", FTS David Phelps ("Phelps").[1]

Her initial allegations of hostility were fairly innocuous and gender neutral. She would ask a question, to which no one would allegedly provide an answer; allegedly, no one gave her her phone messages; sometimes a patient for whom she was directly responsible would ask where she was and "they" would allegedly advise the patient that they did not know where she

---

1. Fairbrother failed to call Phelps as a witness in the trial of this matter.

was; Boisvert allegedly was staring at her, apparently scrutinizing her work. In November of 1999, Fairbrother went to nurse supervisor Al Davis ("Davis") to request that he hold staff meetings because of what she perceived as hostility on the unit. She told him that "generally, ... the employees on the unit weren't getting along, and she thought that ... she could work the problems out on the unit." Deposition of Allen Davis, March 7, 2003, at 39:8–10 (entered into trial via videotape). She gave no specifics as to what she perceived. *Id.* 39:11–12. Davis went on vacation shortly after Fairbrother's request. As he returned, Fairbrother went on vacation. Accordingly, no staff meetings were held until late February—early March, 2000. The purpose of the meetings was to put things out on the table concerning all that was going on on Unit One, with all staff to be involved in open and frank discussion. Statement of Tammi Brown, taken June 25, 2001, 12:1–3. A secondary purpose was to determine a way for the staff to work with Fairbrother. *Id.* There were eight or nine meetings and the staff and supervisors, including Director of Human Resources, Pamela Morrison–Wolf ("Morrison"), found that they were not effective. Although Fairbrother stated that "they all ganged up" on her at these meetings, the other attendees each noted that she was not the only staff member whose conduct and treatment of the patients were discussed. Fairbrother was not receptive to any critique of her performance, denied all instances discussed, and refused to take responsibility for any other actions also discussed. The other staff members commented that they each felt that Fairbrother was undermining treatment on the unit, that she was not following patients' treatment plans, and that, in general, she was not helpful in any way to the running of the unit. Davis Deposition, 26:5–11.

Boisvert acknowledged that, on a particular evening, he had suggested to Fairbrother that she transfer to another unit. He told her that he thought that she would be better off on another unit. The reason he said this to her was due to a particular incidence of her escalating a patient twice within a very short period of time.[2] Boisvert TT Excerpts, Exhibit Four to Pending Memorandum of Law; 19:10–17. At trial, FTS Jacques Ouimette described the two incidents: on a cold winter evening, certain patients were to be escorted to a group session. The patients were lined up, with their winter coats on. The door was opened and the patients were leaving. The last person in line recalled that he needed his coat and pass. He asked Fairbrother if he could run to get them, which request was granted. The patient then ran down the hall, grabbed his coat, and ran back. Before he could get back, Fairbrother had closed and locked the door and merely stated "too late." The patient became very agitated and Ouimette had to de-escalate him. The patient returned to his room. Shortly after, he came out of the room, calmed down, and requested to make a telephone call. He asked Fairbrother to put him on the telephone, which request was again granted. The patient could not recall the number off the top of his head, so he bent over and took a paper out of his sweatpants. As he stood up to give Fairbrother the number, she said, again, "too late. That's it." The patient then became so agitated that Ouimette had to call other staff members to aid him in the patient's de-escalation. TT, Ouimette, Vol.2, 99:17–25; 100:3–16; 100:20–25; 101:1–13.

---

**2.** To escalate a patient means "getting them into an agitated state." Boisvert, Vol. 2, at 65:20.

Many of the FTS' testified at trial to a multitude of other acts of Fairbrother's escalation of patients.[3] Boisvert and the other staff members were also concerned about her lack of communication about any issues which arose on the unit. To them, her secretiveness put them and the patients in danger. Boisvert also believed that Fairbrother was not to be trusted and that she refused to take responsibility for her actions. The others who testified all agreed with this analysis. Fairbrother vehemently responded that, although she did not trust her co-workers, there was no basis for them to mistrust her.

One of the grounds for Fairbrother's sexual harassment complaint was that Whiting was "permeated" with pornography and other sexually explicit items. However, she knew that, unless disallowed by their doctors, the patients at Whiting were allowed to have magazines such as Playboy, Penthouse, and Hustler in their rooms. They were not allowed to bring them out of their rooms at any time. If they did, or if a doctor changed his or her order, the magazines would be confiscated by the staff. Generally, if material was confiscated, it would have to be brought to the patient's treatment team for review. Until the treatment team could hold its meeting regarding a confiscation, the ma-

terial was put in a sealed and labeled envelope, box, or any acceptable container. Quite naturally, as the material was being transferred from the patient to the treatment team, the materials could be found in the staff area until boxed. Therefore, even as part of the job, it could be necessary to come into contact with these materials in the staff area. This was the acceptable, normal policy at Whiting and was not a violation of the sexual harassment policy, according to the Director of Human Resources, Pamela Morrison–Wolf ("Morrison").

Lieutenant Steven Caron, ("Caron"), of the Whiting Police Department, advised that the mail was carefully screened and inspected. If any member of the staff found pornographic materials left in the staff areas or bathrooms, he or she should report it to the police, who will investigate and, if found, confiscate the material. The police at Whiting perform monthly "environmental" checks, where Caron, a nurse, and an inspection control person, Larry Wassell, are walked around by a member of the unit. These individuals, along with staff members and members of housekeeping, go through every room on the unit, including all staff areas. TT Caron, Vol. 2, 117:18–25; 118:1–4. If they ever found pornographic materials in the staff area,

---

**3.** On another occasion, in May, 2000, Fairbrother reported that she had encountered four patients in the courtyard, where they had permission to be. She came inside and reported that the most volatile of the patients had called her a "bitch" and that he needed to immediately be restricted to the unit. Brown, Jursch, and another FTS went directly to the courtyard to speak with this individual. With great difficulty, they finally were able to bring the patient inside and isolate him from the others, in order to hear his side of the story. Each of the three remaining patients was also segregated in order each might tell exactly what had happened. The accused individual strongly disputed Fairbrother's claim, contending that she had been

picking on him "right along", and that he had not spoken to her. Each isolated patient verified the original patient's story, that he had not spoken to Fairbrother. The patient, who had a history of physically abusive behavior, became highly agitated. It became so serious that a silent code was called. A silent code is when all resources, including staff on all six units, and security are summoned to assist in a very dangerous situation. It was the consensus that Fairbrother had fabricated the story. Jursch, Vol. 3 12:13–25; 13:1–25; 14:1–17. Ouimette reported yet another instance of escalation. Ouimette, Vol. 2 103:2–21. In rebuttal, Fairbrother, yet again, asserted that they "were both lying."

"We would not tolerate that. We would make a report on it." *Id.* 118:5–9. At no time, beginning in 1999, has he ever found pornography on any unit. *Id.* 118:14–16. He has never seen open sexually explicit material in any staff area or staff bathroom; pornographic literature on bulletin boards; or obscene drawings or vulgarities concerning women in any staff area or on any wall. *Id.* 118:23–25; 119:1–16.

On February 13, 2000, a code was called on Unit Six. Young and FTS Ian Walker ("Walker") were part of the team which responded. When they returned to Unit One, they were sitting in the back room with Tammi Brown, discussing the incident. Fairbrother was in the room, listening to the conversation. According to Young, Walker and Brown, Fairbrother suddenly, stood up, said something to the effect of "here's what I'd do", and reached over and grabbed Walker's genitals. She then left the room laughing. After reflecting on the "Incident", Brown determined that this was a very serious event and that she had to write Fairbrother up for it and to advise her supervisor, Davis, of what had occurred. Neither Boisvert nor Walker wanted Brown to take this action. Rather, they wanted to "keep it on the unit and work things out," Brown, contrary to their wishes, felt that the Incident was a very significant occurrence. The Whiting Police came to the unit that night and took statements of all involved.

Due to an administrative error, Morrison was not advised of the Incident for almost six weeks. She immediately began a comprehensive investigation. Sexual harassment is such a critical and important issue, it should have been immediately reported to either the Human Resources Department or to the Affirmative Action Office, according to Morrison.

Resultingly, Morrison interviewed everyone involved with the Incident. In a report to the DMHAS Director of Labor Relations, dated April 17, 2000, she wrote as follows:

Walker, Brown and Young gave separate but identical versions of the Incident;

Following the Incident, Fairbrother walked out of the room laughing;

In her interview in the presence of Whiting Program Director, Margaret Smith, and District 1199 delegate, Shawn Gallagher, Fairbrother's account contained four outright lies:

1) Fairbrother told her not to bother interviewing Young, as he was not present for the Incident;

2) Fairbrother said that her hand "may have brushed [Walker's] pants." Brown observed that Fairbother "grabbed a handful." Young concurred. The ultimate expert, Walker, said that Brown's phrasing was accurate.

3) Fairbrother said that her action "amused" Walker. Both Brown and Young observed that Walker turned red and seemed embarrassed. Walker said that he was "embarrassed and shocked."

4) Fairbrother maintains that she subsequently apologized to Walker. "I started to ask Walker if she had, but as soon as I had spoke[en] (sic) the word 'apologized' he interrupted me with a forceful 'Never!' ".

Even at the time of the interview, Fairbrother did not seem to take the issue seriously. "She said they were 'just fooling around'."

A number of employees are outraged at Fairbrother's actions; they cite an apparent "double standard" favoring a female offender and ask what would hap-

pen if a male employee grabbed a woman's breast ?

Plaintiff's Trial Exhibit 9.

The Office of the Commissioner responsible for DMHAS and Whiting wanted Fairbrother terminated. However, if Fairbrother acknowledged the episode and took responsibility for it, Morrison had the authority to suspend her, instead. Morrison. Vol.2. 79:1–25; 80:1.

On April 25, 2000, Fairbrother's attorney wrote to Morrison, explaining that a union delegate had advised Fairbrother that a *Loudermill* hearing had been requested with respect to the Incident.[4] The attorney next wrote that it was his position that "a *Loudermill* hearing would be an unwarranted and a continuation of the sexual harassment that Ms. Fairbrother has been subjected to.... Please be advised that if this issue is not resolved promptly, we will file a complaint with CHRO and EEOC over the continued sexual harassment of Ms. Fairbrother." Morrison had no idea what the attorney was referring to, as Fairbrother had *never* spoken of sexual harassment to any individual in the entire DMHAS.

Accordingly, on May 4, 2002, Morrison wrote to Fairbrother, advising her that a *Loudermill* predecisional conference would take place on May 9, 2002, to discuss a charge of Fairbrother's violation of DMHAS Work Rule # 21 (Racial, ethnic, or sexual harassment of any person is prohibited). She wrote that the results of Morrison's investigation of the Incident supported this charge. Morrison advised her that the maximum discipline under consideration for this violation was up to, and included, dismissal from state service.

Fairbrother's immediate response at the hearing itself was that "they're all lying!

This is harassment!" Her union representative attempted to calm the atmosphere by maintaining that "Ms. Fairbrother said that 'she didn't mean "it" [unexplained] maliciously.'" Denise Ribble, the Director of Whiting, responded that the gesture or contact was absolutely inappropriate; that she was extremely concerned that Fairbrother would even joke about treating a patient in this manner. The union then asked for a caucus and left the room with Fairbrother. When they returned, Fairbrother announced that she wanted to apologize; that she knew it was wrong; that it had been spontaneous; that she never should have done it; that it would not happen again; and, that it was totally inappropriate. Based on this acknowledgment, Morrison advised Fairbrother that, as soon as the matter had been decided, she would advise her of the discipline, if any, to which she would be subject.

Regardless of Fairbrother's position at the *Loudermill* hearing, she completely retracted it just three days later when she filed her first CHRO complaint. In the complaint, she denied touching Walker's genitals, averring that, when she only motioned toward him, "he looked up and smiled", as did Brown. Continuing, she averred that she had apologized to Walker on the very night of the Incident. According to Fairbrother, during the *Loudermill* hearing, Morrison had been "very nasty. She asked me if I denied everything and I said 'yes'". **It was not until this complaint** that Fairbrother ever spoke of any sexually explicit occurrences on Unit One. In this complaint, Fairbrother avered: "The men constantly tell dirty jokes and make sexual remarks." On one occasion, as she was pouring coffee for everyone, Colavito was alleged to have remarked

---

4. *See Loudermill v. Cleveland Bd. Of Educ.,* 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988).

that she should wear a french maid's outfit when pouring coffee. "The men are constantly talking about having sex with there wives and talking about penis' and penis sizes. There are also Playboy magazines on the Unit." Affidavit of Illegal Discriminatory Practice by Greta Fairbrother, May 12, 2000 at ¶ 30.

On June 22, 2000, Morrison simply advised Fairbrother that, "[g]iven your willingness to accept accountability for your actions and in light of your sixteen years of state service, the Hospital has reduced your discipline from dismissal to fifteen days' suspension without pay... We recommend that at the conclusion of your suspension you receive re-training in Physical/Psychological Management Training ... If you are experiencing personal problems that are negatively affecting your work, please contact... the Director of DMHAS EAP Coordinator for referral for an appropriate treatment modality." [5]

The next day, June 23, 2000, Fairbrother called in and requested an extended leave. In a letter which followed, Fairbrother wrote that she had waked up on the morning of June 23 and immediately felt a recurrence of a back problem, which problem had not bothered her for eleven years. She was out of work for the next nine weeks.

After she returned to work, on September 28, 2000, Fairbrother's annual evaluation was done by Boisvert and Brown, and reviewed by a Whiting Program Manager. By DMHAS standards, it was deemed an unsatisfactory evaluation. Morrison, who had discussed the review with Boisvert and Brown, testified that she would have been "very surprised" if the Incident did not result in a lower evaluation. Morrison, Vol.2 81:6–10. The comments at the end of the unsatisfactory review explained:

that she had received a 15–day suspension without pay due to the Incident; that she generally failed to demonstrate her ability to follow all policies and procedures; that she failed to recognize change in the unit milieu and report to her immediate supervisor in a timely fashion; that she did not consistently recognize the special needs of the patients; that she did not consistently interact or report to co-workers and immediate supervisor; that she did not consistently report changes in the patients' conditions; and that she made reference to utilizing inappropriate techniques with agitated patients with an inappropriate gesture. (the Incident). Plaintiff's Trial Exhibit 11. Fairbrother grieved the review, which grievance was denied. The union also refused to take it to arbitration.

On October 10, 2000, Fairbrother filed an Amended Complaint with the CHRO and EEOC. In her sworn statement, Fairbrother averred that she was amending the Complaint due to the retaliation she had been subjected to as a result of the filing of her first Complaint. She included as events of retaliation: the above-referenced unsatisfactory evaluation; the initial denial of her workers' compensation claim, which claim was based on her eleven-year old injury; and an order that she was to avoid unit one at all times. For the *first time ever,* she reported that she had found pornographic magazines on Units One, Four, Five, and Six. She averred that the magazines were often left out and opened to a particular page, or that they were lying on, inside or outside, the staff nursing stations or bathrooms. She identified the pornographic magazines as Playboy, Hustler, Fox, Gallery, and "Hig City." [sic]. She identified another female staff member who allegedly had found a porno-

**5.** It is obvious from the language of this letter, Morrison had not yet seen the CHRO report. When she finally did, she began an immediate investigation into the charges in paragraph thirty and failed to verify any of them.

graphic magazine in a desk drawer in the staff area.[6]

Upon notice of these claims, the Whiting Police Department performed an immediate search and found nothing on any unit, staff nursing stations, or bathrooms.

Prior to the CHRO taking any action on this Amended Complaint, Fairbrother filed the instant lawsuit on January 30, 2001.

## LEGAL ANALYSIS

### Federal Rule of Civil Procedure 50

■ Because a judgment as a matter of law ("JMOL") intrudes upon the rightful province of the jury, it is highly disfavored. The Court of Appeals for the Second Circuit has repeatedly emphasized that, when confronted with such a motion, the Court must carefully scrutinize the proof with credibility assessments made and inferences drawn against the moving party. *Luciano v. The Olsten Corp.*, 110 F.3d 210, 214–15 (2d Cir.1997); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 119 (2d Cir.1994).

The standard governing a motion for JMOL pursuant to Rule 50, formerly denominated as a motion for directed verdict or a motion for judgment notwithstanding the verdict, *see generally Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir.1993), is well established. Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in her favor. *Galdieri–Ambrosini v. National Realty and Development Corp.*, 136 F.3d 276, 289 (2d Cir.1998)(granting motion in Title VII retaliation and gender discrimination case). *Accord Kinch v. Dollar Rent–A–Car Systems, Inc.*, 17 Fed. Appx. 13, 15–16 (2d.Cir.2001); *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir.2000); *Stratton v. Dep't. for the Aging*, 132 F.3d 869, 878 (2d Cir.1997); *Sir*

*Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir.1992). In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. *Galdieri–Ambrosini*, 136 F.3d at 288. Thus, judgment as a matter of law should not be granted unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir.1994) *quoting Bauer v. Raymark Industries, Inc.*, 849 F.2d 790, 792 (2d Cir.1988)(internal citations omitted).

■ In summary, then, the burden on the Defendant is substantial.

### JMOL As To Title VII Retaliation

Within the framework of Rule 50, the Court will consider the propriety of JMOL in light of the substantive law of Title VII retaliation.

It is axiomatic that, in order to prove a case of retaliation under Title VII, a plaintiff must prove, as part of her *prima facie* case, that she was subjected to an adverse employment action that was causally related to her protected activity. *See* Jury Charge at pp. 13–14 (instructing that Plaintiff had met her burden as to the first two elements of Title VII retaliation, leaving the question of adverse employment action and causation to the jury).

---

6. Fairbrother also failed to call this woman, Jenna Drysdale, to testify at the trial.

In the present case, Plaintiff filed a CHRO Complaint on May 12, 2000. After that date, the adverse employment actions that Fairbrother alleged in support of her retaliation claim consisted of: her transfer to a different unit within Whiting, the initial denial of a worker's compensation claim, an unsatisfactory service rating in September, 2000, and a written warning in January, 2001.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In this Circuit, to constitute an adverse employment action in violation of Title VII, a change in working conditions must be "materially adverse." *Galabya v. New York City Board of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (internal quotations and citations omitted). *See also Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). *Accord* Jury Charge at p. 14. *See also Crady v. Liberty Nat'l Bank and Trust Co. Of Ind.,* 993 F.2d 132, 136 (7th Cir.1993) (same); *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999)(temporary assignment insufficient); *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough).

Indeed, a survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep. *Brown,* 199 F.3d at 456. *See, e.g. Banks v. East Baton Rouge Parish School Board,* 320 F.3d 570, 576–77 (5th Cir.2003)(employer's act of not giving employee right of first refusal not adverse employment action); *Forkkio v. Powell,* 306 F.3d 1127, 1130–31 (D.C.Cir.2002)(no adverse employment action when transfer caused only alleged "loss of prestige"); *Marrero v. Goya of Puerto Rico., Inc.,* 304 F.3d 7, 25 (1st Cir.2002) (not enough that plaintiff felt stigmatized and punished by transfer; more tangible change in duties or working conditions necessary); *Hunt v. Rapides Healthcare Sys.,* 277 F.3d 757, 769 (5th Cir.2001) (action that "does not affect job duties, compensation, or benefits" not adverse employment action); *Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 (10th Cir.1998) (purely lateral transfer fails *prima facie* case); *Dilenno v. Goodwill Indus.,* 162 F.3d 235, 236 (3rd Cir. 1998)(mere idiosyncracies of personal preference not sufficient as adverse employment action); *Horn v. County of San Diego,* 1997 WL 579145 at * 2 (9th Cir.1997)(plaintiff's transfer amounted to subjective loss of job satisfaction rather than adverse employee action); *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (if change of job responsibilities are not so significant as to constitute a setback to plaintiff's career, no adverse employment action); *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 886–7 (6th Cir.1996)(transfer with same rate of pay and benefits, with no materially modified duties not adverse employment action); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994) (to be adverse, change in work assignment must cause "materially significant disadvantage").

In the present case, Fairbrother testified that she suffered no loss of income, benefits, or overtime. Unit Six, to which

she was transferred in June, 2001, offered her the same position in terms of rate of pay, stature, benefits, credit toward retirement, and job duties. TT, Fairbrother, Vol. 1; pp. 155:24 to 157:12. The only loss she suffered was emotional. *Id.* at 157:13–15.

 Although she did not testify during the trial as to the issue, Fairbrother asserts in her memorandum of law in opposition to the present Motion, that she was also "punished and put in danger" when the administration put her into a "floating" position from the time she left Unit One until her permanent assignment to Unit Six on June 27, 2001.[7] There was no testimony from any deposition or trial witness that a floating position is a dangerous position, especially when one's duties and responsibilities remain the same and one continues, as did Fairbrother, to work overtime on those units. In any event, "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781–82 (1995). Fairbrother was assigned to float on different units for a reasonable period of time until she was permanently assigned to Unit Six. The Court holds that such a mediate decision is not an adverse employment action within the strictures of the authority noted above.

 The same is true as to her complaints of the initial denial of her worker's compensation claim and the written warning she received on Unit Six in January, 2001. As to her worker's compensation claim, Plaintiff contends that the initial denial of her claim was an adverse employment action, done in retaliation for her CHRO Complaint. However, Plaintiff's own testimony establishes a legitimate, non-retaliatory reason for the initial denial of her claim. Plaintiff's work-related injury occurred in 1989. After her initial treatment, she sought no further treatment for eleven years. There was no physical, work-related incident which triggered her back injury to act up in May, 2000, to cause her to miss nine weeks of work. Rather, Plaintiff attributed it to "stress." TT, Fairbrother; Vol. 3; 114:13–25, 115:1–15. After further review of her claim, the claim was paid in full. Thus, Plaintiff lost nothing; this is not an adverse employment action. *Accord Trigg v. New York Transit Authority et al.*, 2001 WL 868336, at *10 (E.D.N.Y., July 27, 2001), 2001 LEXIS 10825 at * 30 (effort to deny unemployment benefits not adverse employment action); *Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 245 (N.D.N.Y. 1999)(same). The same is true as to her January, 2001 write-up by her supervisor. Fairbrother grieved the write-up, which write-up was overruled and removed from her file. Again, she suffered no loss. *See Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 247–48 (S.D.N.Y.2001)(reprimands and threats of disciplinary action not adverse employment actions)(collecting cases). "Interlocutory or mediate decisions having no immediate effect upon em-

7. Fairbrother was permanently reassigned due to the facts that "... a patient whom you had escalated in the past ... has made threats against you. In addition, your colleagues in Unit 1 have voiced concerns regarding their safety in light of the unsubstantiated allegations which you have made against them in the past." For this latter reason, she was also barred from the confines of Unit One, which she considered to be an adverse employment action, because she had to walk around the building to get to her other units, which took five minutes, instead of the two it would take should she be able to cut through Unit One. TT, Atty Witt, Vol.1; 79:2–24; 81:6–8. The Court disagrees. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir.1998)(increase in commute of thirty minutes not adverse employment action).

ployment ... were not intended to fall within the direct proscriptions ... of Title VII." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981)(en banc); *accord Dollis*, 77 F.3d at 781–82. The Court is in full agreement with the rationale of these cases and, accordingly, holds that neither event constituted an adverse employment action.

■ Fairbrother's final assertion of retaliation is her adverse service rating performed in September, 2000, by Boisert and Brown. The unsatisfactory evaluation was due, in principal part, to Plaintiff's poor judgment in grabbing the genitalia of Ian Walker. TT, Boisvert, Vol. 2; 83:12–17. *See also* Plaintiff's Trial Exhibit 11 (setting forth five other reasons for unsatisfactory review).

■ Fairbrother contends that Boisvert and Brown should not have done the review without referring to her earlier reviews and supervisors. However, Boisvert had been her Lead FTS in excess of one year and Brown her supervisor for nine months. This is more than enough time to become acquainted with the person being supervised. In any event, "[n]egative evaluations alone, without any accompanying adverse consequences, are not adverse employment actions." *Pellei v. International Planned Parenthood Federation*, 1999 WL 787753 at *12 (S.D.N.Y., September 30, 1999), 1999 U.S. Dist. LEXIS 15338 at *34. *See also Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 283–84 (S.D.N.Y.1999)(negative evaluations alone, without accompanying adverse result not cognizable)(collecting cases); *Gallo v. Herman*, 1999 WL 249709 at * (S.D.N.Y., April 28, 1999)(lower than previous rating caused no material impact on job and conditions of employment; no adverse employment action); *Castro v. New York City Bd. Of Educ. Personnel*, 1998 WL 108004 at * 7 (S.D.N.Y., March 12, 1998)(negative evaluations "unattended by a demotion, diminution in wages, or other tangible loss

do not materially alter employment conditions").

Here, Fairbrother failed to demonstrate that the one negative service rating caused a materially adverse change in her working conditions. It is beyond cavil that no such evidence exists, as there was no materially adverse change whatsoever.

In light of the overwhelming legal precedents and the equally overwhelming lack of evidence to support the finding of an adverse employment action in this case, the Court holds that no reasonable or fair minded persons could have arrived at the verdict returned in this case. Plaintiff's evidence, viewed in the light most favorable to her, is completely insufficient to permit a reasonable juror to find that she was retaliated against within the strictures of Title VII. Resultingly, Defendant's Motion for JMOL as to the *prima facie* case of retaliation under Title VII is hereby GRANTED.

### JMOL: Sexual Harassment; Hostile Work Environment

■ Disparate treatment prohibited by Title VII also encompasses sexual harassment that leads to "a hostile or abusive work environment." *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also EEOC Guidelines on Sexual Harassment*, 29 C.F.R. § 1604.11 (2000)(sexual harassment includes "conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment"). In order to prove a claim of hostile-work-environment sexual harassment, a plaintiff must establish two elements. *Fitzgerald v. Henderson*, 251 F.3d 345, 346 (2d Cir.2001)

First, she must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environ-

ment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (citation and internal quotation marks omitted). *See also, Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149; *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir.1993). Title VII does not authorize a hostile work environment claim for conduct that was merely offensive, rather than sufficiently "severe or pervasive" that a reasonable person would find the environment hostile or abusive. *See, e.g., Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Meritor Savings*, 477 U.S. at 67, 106 S.Ct. 2399 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23, 114 S.Ct. 367.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." "Properly applied, they will filter out complaints attacking the 'ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing,' We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment...." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).

██ Second, the plaintiff must show a specific basis for imputing the hostile work environment to the employer. *See, e.g., Perry,* 115 F.3d at 149; *Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.),

*cert. den'd,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kotcher v. Rosa & Sullivan Appliance Center,* 957 F.2d 59, 62 (2d Cir.1992). Although limited defenses may be available, an employer is presumed to be responsible when the perpetrator of the harassment was the victim's supervisor. *See, e.g., Burlington Industries v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. However, if the supervisor's harassment did not culminate in a "tangible employment action", *Burlington,* 524 U.S. at 765, 118 S.Ct. 2257; *see Caridad v. Metro–North Commuter RR.,* 191 F.3d 283, 294 (2d Cir.1999)(constructive discharge not considered "tangible" employment action for these purposes), an employer may avoid liability if (a) it "exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) ... the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257; *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 (2d Cir.1998). Those circumstances constitute an affirmative defense on which the employer has the burden of proof. *Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257.

██ On the other hand, when the alleged harassment is attributed to co-employees, the "employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment, but did nothing about it." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995).

### i. *The Trial Testimony*

Fairbrother testified that, when she first was assigned to Unit 1, she had no problems working with any of the staff mem-

bers. TT Fairbrother, Vol.1, 33:12–14. Things started going badly for her approximately one year later. *Id.* 33:15–20. However, things grew increasingly worse in late 1999, as the hostility increased against her. *Id.* 34:17–23. Examples of alleged conduct making her uncomfortable were "foul language and pornographic literature in the staff areas and staff bathrooms." *Id,* 39:22–24.[8] She testified on direct that the pornographic literature was personal to the staff, that they brought the literature to work with them. She acknowledged on cross-examination, however, that she had never seen anyone do this. *Id.* 125:3–7; 21–23. Although she claimed that "generally, the staff carried pornography around with them", she could not identify any such staff member. *Id.* 125:10–17. Fairbrother finally agreed that she "did not know any of this for a fact." *Id.* 126:13–14.

Fairbrother alleged that she would make and bring coffee to the entire staff and, that, on one occasion, one male staff member *may* have made a remark that she should wear a french maid outfit if she was going to bring them coffee. Id. 42:13–14; 21–23. FTS Jursch refuted her allegations, "just the opposite", asserting that, after she would make coffee for herself and her best friend, Phelps, she would pour the rest of the coffee out. Accord, TT, Ouimette, Vol.2 98:18–21. Further, Jursch testified that the possible "french maid" charge was not true. Jursch, Vol.3 15:16–18

As to the Incident, Fairbrother testified that she did not touch Walker's genitals. Fairbrother, 49:17–18. She may have "brushed his pants." *Id.* 49:15–16. According to Fairbrother, Walker looked up at her and smiled, and may have been "a little bit embarrassed." *Id.* 49:19–22.

When Brown advised Fairbrother that she was going to have to report the Incident, Fairbrother allegedly responded that "it was just a joke". *Id.* 52:1. Fairbrother next testified that Brown also thought it was a joke but that it could be misconstrued. Fairbrother alleged that the only reason that Brown told her that she had for writing the Incident up was that Brown was still on probation. *Id.* 52:2–5. Brown denied this conversation completely. Defense Exhibit W, Statement of Tammi Brown, taken June 25, 2001, 8:16–23. On rebuttal, Fairbrother took no issue with Brown's denial.

Fairbrother next testified that Morrison should have never investigated what was merely a joke and where she "never grabbed [Walker's] crotch. It should have never been blown up into what is was." *Id.* 175:23–24; 176:3–4. She refused to agree with defense counsel that someone in Human Resources should look into such a charge to see if there is any basis for it, claiming "[n]o, it never should have gotten out of hand the way it did." *Id.* 176:11–15. There should not have been an investigation because Brown, Young, and Walker "set me up, is what they did." *Id.* 177:2–3.

At trial, Fairbrother continued to claim that Young was not present for the Incident. If Young testified to the contrary, and swore under oath that he was indeed present and saw Fairbrother "grab Walker's genitals," then he would be lying. *Id.* 135:3–8. Brown was also lying if she were to confirm the Incident. *Id.* 134:23–25; 135:1–2

If Walker testifies under oath that Fairbrother grabbed his genitals, then, he, too, is lying. Even though she acknowledges that Walker is in the best position to know what happened, he is still lying. Fairbrother, 135:9–13. Indeed, all witnesses

---

8. As noted above, although she referred to offensive language in her initial CHRO Complaint, filed in May, 2000, any references to pornography were not alleged until she filed her amended complaint in October, 2000.

who testified about her in any negative manner were "all lying." *Id.* 136:4–5. In fact, Boisvert, Young, Colovito, and Ouimette, were all involved in a conspiracy against her. *Id.* 175:15–18.

When Brown, Young, and Walker all gave statements to Morrison that Fairbrother had grabbed Walker's genitals, they did so "to set her up." *Id.* 176:24–25.

As to the Incident, Walker testified as follows: On the evening of February 13, 2000, Brown, Young, Fairbrother, and he were discussing a code on another unit. Fairbrother began to describe how she would handle it and, in the process, "stood up and grabbed my crotch and left the room." *Id.* 36:10–17 She definitely "grabbed [his] testicles", not merely brushing his pants. *Id.* 36:18–22. He was embarrassed by the Incident. *Id.* 36:25–37:1. Later that evening he was called to the supervisor's office to describe what had happened to him. Regardless of the atrocity of the conduct, he did not want it reported, but hoped to settle it within the unit. *Id.* 37:16–19. Walker further testified that, to the date of his trial testimony, Fairbrother had never apologized to him, regardless of her contention that she did. *Id.* 42:12–13

Young testified that he was most certainly present during the Incident, regardless of Fairbrother's claim to the contrary, and that he could see clearly. Young, Vol. 3, 49:17–19; 24–25. He testified that, in saying "this is what I would do", "her hand came across and hit him in the crotch, plain as day." *Id.* 49:24–25; 50:1–6.

Finally, Brown confirmed the Incident. She described it as follows: She was in the

rear staff room with Young and Walker, who had just returned from a code on another unit. "Greta came into the back room and was sort of listening to what we were saying. All of a sudden [she] just grabbed Ian's crotch and said '[i]f I were there, this is what I would have done.'" Walker appeared to be very embarrassed. There was no question in Brown's mind that Fairbrother actually grabbed Walker's crotch. Statement of Tammi Brown, Exhibit V, 6:8–25; 7–12. Fairbrother finally testified as to an occurrence which allegedly happened several days after the Incident. She was out in the courtyard, doing her daily, recreational, laps. It had just snowed. Another (unidentified) FTS came out with a ruler to measure the snow. Brown and Colavito were in the staff area, and Colavito was alleged to have hollered: "I hope it's as much or as long as your dick". Fairbrother, Vol. 1, 58:7–14. Although the unidentified FTS allegedly replied, Fairbrother could not recall what he had said. *Id.* 59:1–2. Fairbrother testified that she returned to the staff office in order to confront Brown. "I said to Tammi, 'Tammi, I find it very distasteful in lieu of what happened just yesterday (the Incident) that you're laughing and joking about things of this nature.'" *Id.* 59:12–15. She did not specifically mention what Colavito had allegedly just done, only that she was offended by "foul language on the unit." Although Brown advised her that she could not compare the Incident with foul language, they would have a meeting with a nurse supervisor, in order that Fairbrother might state her concerns.[9]

9. Brown testified that, after she wrote Fairbrother up for the Incident, Fairbrother began to threaten her emotionally and, in the end, physically. Fairbrother told Brown that "I guess we'll have to just start a tit-for-tat war." Brown 56:1–6. Next, if Brown and Fairbrother were walking down a hallway,

Fairbrother would veer into Brown's path in order to "bump" her. Had Brown not moved each time, she would have been physically pushed by Fairbrother. It finally had happened so often, that Brown reported it to the Whiting Police. Id. 56:17–25

The next day, Brown, Fairbrother, Burgess, and nurse supervisor, Angela Kerin, met. At this meeting, Fairbrother never mentioned the alleged Colavito remark and stated that she was not offended by any language on the unit. Deposition of Tammi Brown, Defense Exhibit V., 29:13–31:15–23. She did say, without specifics, that she had concerns about the way others on the unit were treating her. This, too, inspired the staff meetings. *Id.* 31:23–25; 32:1–4. When asked whether Colavito had made the sexual comment attributed to him by Fairbrother, Brown emphatically responded, "[d]efinitely not." *Id.* 29:21–25; 30:1. On rebuttal, Fairbrother never challenged Brown's denial of the alleged Colavito occurrence.[10]

Fairbrother further testified that all of her male co-workers began to call her a "bitch" on a daily basis. and, on five or ten occasions, "a whore". These same male co-workers were alleged to talk every day about their sex lives with their wives and invited her into these conversations by asking her "how [she] did it." *Id.* 46:25–47:2. This happened just about every day. *Id.* It included all male co-workers with the exception of "my friends, Dave Phelps and Rich LaBella." *Id.* 174:23–25; 175:1–14.

Every male co-worker who testified was vehement in his denial of any of the misconduct allegedly attributed to him. Boisvert testified that he had never called Fairbrother a "bitch" or a "whore". Boisvert, Vol. 2, 71:15–19. He never heard any other staff member call her these names; "I wouldn't allow it..." "I would have stopped it right then and there." *Id.* 71:20–25. Boisvert went on the testify that he had never seen any staff member

looking through sexually explicit literature, let alone intentionally "leaving them open for Greta Fairbrother to see." *Id.* 72:18–21. As with all other staff and administrators who testified in identical fashion, Boisvert stated with certainty that Fairbrother had never: objected to alleged pornographic material in the staff areas; complained about a hostile work environment; claimed that she was being subject to sexual harassment; claimed someone told her to wear a "french maid" costume; advised him that there were inappropriate notes on the bulletin board; advised him that she did not like the way her male co-workers treated her, were excluding her, or sexually harassing her; or, finally, that pornography was permeating Whiting. *Id.* 73:2–15; 76:4–12; 77:1–3. To his knowledge, Fairbrother never complained to anyone at DMHAS that she was the subject of sexual harassment. *Id.* 73:18–20. None of the many women with whom he had ever worked on Unit One ever had complained of pornography on Unit One. *Id.* 79:25–80:1–10. At no time did any member of the Whiting police, making their routine environmental checks, advise Boisvert that pornography was inappropriately in the staff area. *Id.* 81:20–25.

Boisvert also testified that Fairbrother was giving "provocative" massages to Phelps in the main nurses station, which is all windows. The residents, clients walking by, anybody was in clear view of them. "I was very disgusted and disappointed in their behavior." He told Phelps the next day that such behavior had to immediately stop. Fairbrother, who went on vacation that day, apologized to Boisvert upon her return. Nevertheless, the massages continued. *Id.* 70:2–23; 76:21–25. After the

---

10. On rebuttal, Fairbrother did not challenge the substantive testimony of any defense witness. Her only claim with regard to any of the testimony was that Ouimette and Jursch were still lying. Her only further substantive

testimony was when she stated that: she had no memory of the dual escalation of the pass/telephone patient; and, she had not given Phelps a forty-five minute massage. Fairbrother Rebuttal, Vol. 3: pp. 128–136.

Incident, Fairbrother's treatment of Boisvert, the staff, and the patients worsened. "There was more escalation of patients." *Id.* 78:16–21.

Jursch stated that he had never called Fairbrother a "bitch" or "whore", nor had he ever heard any of his male co-workers use this language toward her. Jursch, Vol.3, 15:15–18. On rare occasions, the men would use profanity or tell an off-colored joke, but it was never in the presence of Fairbrother. "It's a very human environment." *Id,* 30:10–17. He denied any discussion of his sex life with his co-workers. In fact, according to Jursch, the only male staff member who ever discussed his sex life with his wife was Fairbrother's best friend, Phelps. *Id.* 19:15–21. *Accord* Ouimette, Vol. 3, 50:5–8. Jursch, too, was also very concerned about the provocative massages Fairbrother gave Phelps in the staff areas, where patients could see them. The specific one he remembered "clearly" was a forty-five minute massage, covering the entirety of Phelps' upper torso. He reported his concerns to Boisvert because there was "a lot of touching [between Fairbrother and Phelps] that was not platonic. That kind of touching at work is totally inappropriate, especially in a maximum security setting." Jursch, Vol. 3, 16:18–25: 17:1–2; 18:1–5. Jursch also testified that Fairbrother never told him that she was being sexually harassed or that the alleged sexually explicit magazines on Unit One were harassing to her. *Id.* 18:6–9. He never saw pornographic materials left open in the staff area, let alone opened specifically for Fairbrother. *Id.* 19:1–3. Jursch testified further that he had never seen any sexually explicit materials of any kind on the bulletin boards on Unit One. *Id.* 21:15–22. *Accord* Burgess, 62:6–8; Walker, 39:11–13.

Walker never called Fairbrother a "bitch" or "whore", nor did he ever hear Boisvert doing so. Boisvert was always a professional in all of his dealings with staff and patients. Walker, Vol. 3, 39:3–10. Walker never saw any pornographic materials left open on Unit One, nor did he ever see sexually explicit materials on any of the Unit's bulletin boards. *Id.* 39:11–16. Finally, Walker "would never" speak about his sex life with his wife, nor was he ever present when any male staff member on Unit One allegedly did so. *Id.* 40:13–18.

Young "doesn't even talk about his sex life with his friends," let alone co-workers. He never called Fairbrother a "bitch" or "whore" and never heard anyone else do so. Also, he never observed any male staff member making any kind of sexual comments to Fairbrother. Young, Vol. 3, 47:6–19. Young testified that he never carried "anything" to work, especially pornographic literature. He never saw anyone else do so. Fairbrother never complained to him that she knew the male staff members were bringing in such literature, either. *Id.* 47:24–25; 48:1–8. Further, Fairbrother never told him that she was offended by his conduct on the unit, and he never heard her confront any other co-worker with such a contention. She never told him that she was offended by pornographic literature or that she was being sexually harassed. *Id.* 50:25–51:1–4. Young testified that, on occasion, the staff would swear at nothing in particular. "It's like stubbing your toe, you swear." *Id.* 53:4–10. Young denied that Boisvert ever asked him to "get Greta" or "to set her up." Boisvert, was at all times, a complete professional. *Id.* 51:23–25. *Accord* Brown, Exhibit V, 8:24–25, 9:1–2; Walker, 51:23–25, 52:1–14.

Other witnesses, mostly female staff members, confirmed what the male staff members testified to. Carol Burgess ("Burgess"), a union representative involved with the Incident investigation, nev-

er found open sexually explicit magazines anywhere on Unit One, nor did she ever see anything sexually offensive on the Unit bulletin boards. Burgess, Vol. 3, 61:11–20; 62:6–8. If anyone finds such materials, they are to report it to a supervisor or the Whiting police and it would "absolutely" be immediately removed. *Id.* 62:12–24. The only time Burgess saw sexually explicit materials in the staff area of any unit was when the magazines had been confiscated and then brought to the attention of the treatment team. *Id.* 68:25—69:1–2.

Burgess sat in on a meeting on February 14, 2000 with Davis and Fairbrother, in her role as union representative. *Id.* 58:23–25. The purpose was to discuss the Incident, which Fairbrother denied, stating that she did not believe that she had touched Walker. Fairbrother was given an oral counseling and advised that further discipline was possible. *Id.* 59:8–10, 18–22; 60:7–10 Later that evening, Fairbrother told Burgess that she would reenact the Incident for her. As she did, Burgess testified that Fairbrother "actually touched" her. *Id.* 60:12–25; 61:1–2.

Morrison explained that sexual harassment was so critical a claim, that, if reported, it would immediately be investigated by Human Resources or the Affirmative Action Office. Morrison, Vol.2, 20:8–11. Fairbrother never reported her claim to either office. *Id.* 30:1–13, Fairbrother was removed from Unit One because, in her May, 2000 CHRO Complaint, "she had [made] allegations that she was the target of sexual harassment and it was for both her protection— if the allegations were true, we didn't want her working in an environment where she was continually subjected to those circumstances. If it was not corroborated, we didn't want any more unsubstantiated allegations against her co-workers." *Id.* 21:21–25; 22:1–6. After Fairbrother had filed her initial CHRO Complaint, Morrison interviewed all staff members on Unit One with regard to Fairbrother's specific allegations in paragraph thirty of the complaint, but could not corroborate any of them. *Id.* 23:22–25; 24:1–3, 6–14. Fairbrother was restricted from walking through Unit One because "she was alleging that the men on One were speaking rudely and offensive[ly] to her. If there was any chance these allegations were correct, we didn't want her subjected to that. On the other hand, if [she was] not speaking the truth, we didn't want the opportunity for her to be there to say they were still doing it." *Id.* 26:1–12. During Morrison's investigation of the Incident, Fairbrother called her continuously, ignoring Morrison's directive not to do so, and claimed "over and over again that they're all liars. It's a conspiracy." *Id.* 30:1–9. Fairbrother never complained to Morrison that she was being called a "whore" or a "bitch", nor did she ever advise Morrison of the pornographic materials permeating Whiting and ask her to investigate. *Id.* 30:1–9. As soon as Morrison learned that the CHRO Complaint had been amended in October to give specifics of all of Fairbrother's pornography contentions, Morrison called the Director of Whiting in order to advise him that he immediately needed a police officer at Whiting to investigate. Sergeant Aubin was dispatched to Whiting on the same day and examined each and every area which Fairbrother claimed was permeated with pornography.[11] Morrison, herself, testified that, during her entire tenure at

---

11. Aubin reported, in a formal report dated November 11, 2003, that he had found absolutely no evidence to support Fairbrother's claim. During his investigation, he interviewed many female staff members, each of whom denied the claim, save one instance of a magazine found in the bathroom on Unit Five. Aubin returned to the bathroom on Unit Five and found nothing.

Whiting, she had never seen any pornographic materials left lying open in staff areas, let alone an institute "permeated with pornography." Morrison was "constantly at Whiting." *Id.* 36:25; 37:3–11.

An FTS on a different unit, Jo-anne Libera ("Libera"), was having difficulties of an unspecified nature with her co-workers on a different unit. Fairbrother advised Libera that, if she would help her with her lawsuit, she would help Libera. Deposition of Jo–Anne Libera, October 10, 2001, read at trial, 10:5–8. Consequently, Fairbrother began calling her and reporting things that were allegedly being said behind Libera's back. However, Libera never knew whether Fairbrother was telling the truth because she was never able to confirm Fairbrother's reports. *Id.* 10:12–13; 11:14–17, 11:18–20. Libera emphatically denied that Whiting was permeated with pornography, stating that, in her twenty years at Whiting, she had found a sexually explicit magazine in a staff bathroom on **one** occasion. Libera reported it to her union representative, it was removed immediately, and she never had another problem. *Id.* 19:10–19;23:16–17. Prior to Fairbrother filing the present lawsuit, she had never complained to Libera that she was being sexually harassed. *Id.* 23:6–9,

Brown confirmed that no other complaints were ever made to her that Whiting was a hostile work environment for women. This included her assignments on the various units at Whiting and overtime on all units. Deposition of Tammi Brown, January 22, 2003, read at trial, 38:11–15, 21–25. Fairbrother herself never made such a claim to Brown, nor did she ever advise Brown that she was being sexually harassed, that Unit One was permeated with pornography left in staff areas, or that all the male staff members discussed their sex lives in front of her. *Id.* 32:11–13; 33:14–17. Brown testified that she never saw open, sexually explicit materials on Unit One, although she had seen it on "rare" occasions on some of the other units. *Id.* 39:23–25; 40:1–7.

As noted above, Fairbrother testified that she approached her supervisor, Al Davis, in order to request that he set up staff meetings to try and straighten the unit out. Davis agreed to do so. Although she testified that her purpose for wanting these meetings was to end the foul language and pornography, Davis denied such testimony, stating that, at no time did she ever complain to him about pornography on the unit, the sexually offensive conduct of her male co-workers, or any sexual harassment. Deposition of Allen Davis, March 7, 2003, read at trial: 26:24–27. She never brought any similar allegations up at the eight or nine meetings held after the Incident. *Id.* 27:1–21. *Accord* Fairbrother; Vol.1, 66:9–14; Brown, 32:20–25; 33:1–10; Jursch, Vol.3 20:21–24.

According to Fairbrother, the unit meetings set up after the Incident were "a circus. Everyone ganged up on me. They made all sorts of baseless accusations. Everyone called me a 'liar.' " Staff members said she was dishonest and "accused me of inciting patients." *Id.* 64:1–7.

Every witness described the necessity of trust among staff members, as it was critical for their own safety and that of others. Fairbrother claimed that she did not trust the staff on Unit One, and, had DMHAS investigated the situation in a proper manner, she would have remained on Unit One, with all the other staff members transferred out. *Id.* 132:12–13; 132:21–22. When, in the meetings held after the Incident, she was advised that her co-workers did not trust her, either, Fairbrother maintained that "they had no basis" for such a charge. *Id.* 133:19–21.

In the end, Fairbrother **never** reported sexual harassment, pervasive pornography on all units, sexually offensive conduct on the part of her male co-workers, or a sexually hostile work environment to **anyone** until after the Incident, when she first alleged some of the behavior in paragraph thirty of her original CHRO Complaint, filed in May, 2000, as amended in October. She never approached the Affirmative Action Office at any time in order to assert sexual harassment, pornography "permeating Whiting", discussions about sex lives, or foul language used against her. Fairbrother, Vol.1, 45:8–15. She never went to anyone in Human Resources. *Id.*, Vol.2, 13:6–8. Finally, she never went to anyone in the administration of DMHAS to report sexual harassment, either. *Id.* 113:4–7.

Had she done so, a written publication would have been issued stating that such behavior would not be tolerated, consistent with the sexual harassment policy of Whiting. Morrison, Vol. 2, 50:21–23. Another thing Morrison would have considered, and which she had done in the past, was to put everyone through sexual harassment training again in order to sensitize the staff. *Id.* 50:23–25. As a result of allegations in the Amended CHRO Complaint, Dr. Cassidy issued a letter to all 500 employees at Whiting that "x-rated" materials should never be posted anywhere within the institute and that anyone with such material was subject to discipline. Fairbrother, Vol. 1 117:10. This was unsatisfactory to her because the letter was not put into the 500 paychecks issued, but were only put in the staff areas of each unit and posted therein. *Id.* 173:21–25; 174:1–6.

Finally, Fairbrother testified that she was familiar with Whiting's sexual harassment policy which outlines exactly how to file a complaint. She was also aware of the general rules of her work place, which also contained the procedure for filing a complaint. *Id.* 156:3–15. She never made use of either.

■ The Court finds, initially, that Fairbrother has failed to provide any substantive evidence that the terms of her employment were altered, that a "term, condition, or privilege" of her employment was affected, or that anyone "unreasonably interfered with her work performance." *See Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Meritor Savings*, 477 U.S. at 67, 106 S.Ct. 2399; EEOC Guidelines, at 29 C.F.R. § 1604.11. She continues to be employed at Whiting, including overtime at her request. She has admitted that she has lost no compensation or benefits as a result of this action, and its underlying allegations. Finally, in none of her testimony did she claim that her work performance was being unreasonably interfered with by any of her co-workers. In contradistinction, all who testified with regard to her performance on Unit One voiced their concerns about her handling of patients, the many times she escalated those in her care, and the fact that she would take no responsibilities for her actions.[12]

Nor has she showed any reason for imputing the alleged hostile work environment to DMHAS. DMHAS has a formal sexual harassment policy, which includes the manner in which to process a claim. Fairbrother ignored this process. She **never** reported her allegations of sexual harassment, permeating pornography, being called a "whore" or a "bitch", or a sexually hostile environment to anyone, including her supervisors, her co-workers, the Department of Human Resources, the Affirmative Action Office, or anyone in the

---

**12.** In fact, not one of the 500 employees at Whiting came forward to corroborate Fairbrother's claims.

Here:

---

---

administration of Whiting or DMHAS. Because she "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm", *Burlington Industries*, 524 U.S. at 765, 118 S.Ct. 2257, it would be a miscarriage of justice to impute liability to DMHAS. DMHAS **knew nothing** of the alleged actions, sexual harassment, or hostile working environment, all due to Fairbrother's silence. How, then, can DMHAS be held liable ? *See Tomka*, 66 F.3d at 1305. This Court will not hold DMHAS hostage to Fairbrother's silence.

This Court finds that Fairbrother's version of the alleged facts is insufficient to permit a reasonable jury to have found that she had been subjected to a sexually hostile work environment. *Galdieri–Ambrosini*, 136 F.3d at 285. There is such an overwhelming amount of evidence in favor of DMHAS, that reasonable and fair-minded persons could not have arrived at a verdict against it. *Cruz*, 34 F.3d at 1154. Again, DMHAS has met its significant burden.

### CONCLUSION

For all of the reasons set forth herein, Defendant's Motion for Judgment as a Matter of Law or a New Trial [Doc. No. 59] is hereby GRANTED. JMOL is GRANTED as to Plaintiff's claims of Title VII retaliation and a Title VII sexually hostile work environment. The Clerk is ordered to close this case.

SO ORDERED