412 F.3d 39
 Greta FAIRBROTHER, Plaintiff-Appellant,
v.
Pamela MORRISON, Chief of Human Resource Operations, I/O, and Jo-Anne Libera, Material Witness, Defendants,
STATE of Connecticut, Department of Mental Health and Addiction Services, Defendant-Appellee.
Docket No. 03-9242-CV.
 United States Court of Appeals, Second Circuit.
 Argued: December 17, 2004.
 Decided: June 14, 2005.
 
 COPYRIGHT MATERIAL OMITTED Appearing for Plaintiff-Appellant: Michelle Holmes, Esq., Sack, Spector & Karsten, LLP, West Hartford, CT.
 Appearing for Defendant-Appellee: Joseph A. Jordano, Esq., Assistant Attorney General, Office of the Attorney General, for Richard Blumenthal, Attorney General, Hartford, CT.
 Before: NEWMAN, POOLER, and KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge.
 
 
 1
 At trial, Greta Fairbrother presented significant evidence of sexual harassment that was sharply disputed by her employer, the State of Connecticut's Department of Mental Health and Addiction Services ("DMHAS") and the other defendants. The jury returned a unanimous verdict in Fairbrother's favor on her claims of both sexually hostile work environment harassment under Title VII and retaliation under Title VII. The district court, however, granted the defendants' motion for judgment as a matter of law on both claims. We affirm the grant of judgment as a matter of law on Fairbrother's retaliation claim, but reverse the district court's order with respect to Fairbrother's hostile work environment claim.
 
 BACKGROUND
 
 2
 We present first the evidence generally supporting Fairbrother's case, followed by that generally supporting the defendants' case. We then summarize briefly the procedural history.
 
 
 A. Fairbrother's Case
 
 
 3
 Unless otherwise noted, the following facts are either undisputed, or based on Fairbrother's testimony or other evidence introduced by Fairbrother at trial.
 
 
 4
 Fairbrother began working for the State of Connecticut in September 1983, and, as of March 1996, worked for the state's Whiting Forensic Institute ("Whiting"), a division of DMHAS, which serves as a maximum-security facility for the criminally insane. At Whiting, Fairbrother worked as a Forensic Treatment Specialist, and in that capacity, provided care and treatment to Whiting's patients.
 
 
 5
 Whiting is divided into six units, and Forensic Treatment Specialists are assigned to work on specific units during one of three specific shifts. After working on Whiting's Unit Five for approximately two years, Fairbrother transferred to Unit One in 1998. The transfer appealed to her because it enabled her to move from the third to the second shift. Fairbrother was the only female working the second shift on Unit One. She reported to William Boisvert, the lead Forensic Treatment Specialist for the unit.[1]
 
 
 6
 According to Fairbrother, Unit One was permeated with hostility toward her, and much of it was of a sexual nature. This was particularly true after the fall of 1999, once the Head Nurse, to whom Boisvert reported, left the unit.[2] Boisvert and the other Forensic Treatment Specialists would not answer her questions or give her messages when people called for her, and when patients would inquire concerning her whereabouts, her colleagues would not tell them where she was. Pornographic magazines were kept in the staff office and the staff bathrooms, and her male co-workers would often show her pictures from these magazines and ask her impression. At any given time, "probably two or three" sexually explicit jokes were posted on the office bulletin board. When Fairbrother brought coffee to her colleagues, she was asked "something to the effect" of "Where's your French maid outfit?" or "Why isn't it on you?". Fairbrother's male colleagues talked about "sex that they had with their wives," and asked Fairbrother about her sexual practices. Boisvert and several of her co-workers, including Forensic Treatment Specialists Chris Colavito, Jacques Ouimette, and James Young, would often call her a "bitch" and a "whore." The discussions concerning sex lives and referring to Fairbrother as a "bitch" happened almost every day. Fairbrother was called a "whore" between ten and fifteen times.
 
 
 7
 Because Boisvert was Fairbrother's supervisor, and the extent of a supervisor's involvement in harassment may affect the employer's liability, Boisvert's participation level may be relevant. Fairbrother testified that Boisvert caused the hostile work environment she faced, stating that the treatment she received was "all at his instigation." When she complained to Boisvert about the presence of pornographic magazines, he "said something to the effect, I've been here eighteen, nineteen, however many years, and I'm not going to stop doing or you're not going to prevent me from, you know, running the unit the way I want to run it." After this conversation with Boisvert, the hostility worsened. Boisvert interrupted a meeting between Fairbrother and the new Head Nurse to insist that Fairbrother be removed from the unit.
 
 
 8
 In mid-February 2000, Fairbrother was taking a break outside in the courtyard when another employee came out with a ruler to measure the snow on the ground. Fairbrother testified that, from in the staff office, Colavito yelled at the employee with the ruler, "I hope it's as much or as long as your d-i-c-k," and that Unit One Head Nurse Tammi Brown laughed at Colavito's comment.
 
 
 9
 Fairbrother testified about several instances in which she lodged complaints concerning her treatment. In October or November 1999, she complained to Boisvert "about materials and the talk on the unit." According to Fairbrother, matters only worsened. In November 1999, she complained to Al Davis, her Nurse Supervisor, about the sexually hostile work environment she was facing, providing him with specific examples of what was occurring. Fairbrother approached Davis again a few weeks later because the situation was "getting increasingly worse." Although Davis promised to set up a meeting to address her concerns, none had been arranged as of mid-February. Apparently, this delay was due in part to intervening vacation schedules of both Davis and Fairbrother.
 
 
 10
 The day after the incident involving the ruler, Fairbrother also met with a Nurse Supervisor to complain that she had found Colavito's statement offensive. At that meeting, Fairbrother declined to file a "write-up" that would have referred the matter to the personnel department, but she reiterated her request for staff meetings concerning the hostility she was facing. At this point, staff meetings involving Fairbrother, Boisvert, and other Unit One employees were arranged. Unfortunately, Fairbrother testified, these meetings degenerated into a "circus" at which her colleagues impugned her integrity and criticized her work performance.
 
 
 11
 An incident on February 13, 2000, in which Fairbrother is alleged to have assaulted Ian Walker, a co-worker,[3] is relevant to Fairbrother's case because it may help to establish when she put Pamela Morrison, a Personnel Director, on notice of her claims. Morrison testified that she learned about the incident in "late February or early March," and began an investigation. When asked about her meeting with Morrison to discuss the incident, Fairbrother stated, "I discussed everything, the whole situation to her and we went back — I went back to my unit." Fairbrother also testified about a telephone conversation with Morrison before a May 9, 2000 "prediscipline hearing" relating to the incident.[4] In that conversation, Fairbrother gave Morrison "all the background information of what's been happening on the unit since the fall of '99," including "[h]ostilities, the magazines, the name calling, the accusations." At the prediscipline hearing, Fairbrother discussed the hostile work environment she claimed she faced.
 
 
 12
 Fairbrother also introduced evidence supporting her claim of retaliation. She testified that, as she was leaving the hearing, Morrison told her, "If you drop your suits, I'll drop mine." Fairbrother declined the alleged offer, filing a complaint with the Connecticut Commission on Human Rights & Opportunities ("CHRO") on May 18, 2000, alleging violations of Title VII, the Civil Rights Act of 1991, and certain Connecticut statutes. This complaint described "hostility" on the unit, the prevalence of "dirty jokes" and "sexual comments" on the unit, and the presence of "Playboy magazines on the unit." After filing this charge, Fairbrother was removed from Unit One and assigned to "float[ ] the building," working in different units as needed. She was told, however, never to enter Unit One. In October 2000, Fairbrother amended her complaint with CHRO, adding a charge of retaliation and alleging that other pornographic magazines, including Hustler, Fox, and Gallery, were present at Whiting.
 
 
 13
 In June 2000, Fairbrother ceased going to work on account of back pain which she attributed to an injury sustained some years earlier. DMHAS initially contested liability for her worker's compensation claim, but eventually, the Department paid the claim. In September 2000, Fairbrother was given an appraisal with an overall rating of "Unsatisfactory." Fairbrother had never received an "Unsatisfactory" rating in the past.
 
 
 B. The Defendants' Case
 
 
 14
 Unless otherwise noted, the following facts are either undisputed, or based on evidence put forth at trial by the defendants.
 
 
 15
 The defendants maintained that most, if not all, of the events that Fairbrother claimed created a hostile work environment never took place; their case was effectively built around an attack on Fairbrother's credibility. To support their position, the defendants called several of Fairbrother's co-workers and supervisors to testify at trial. William Boisvert, for example, denied ever having called Fairbrother a "bitch" or a "whore," said that he had never heard any other staff member call her these names, and added that if he had heard such names being used, he "would have stopped it right then and there." Boisvert also stated that, although Forensic Treatment Specialists would routinely encounter pornography because patients sometimes possessed it, the staff would not leave such material lying around for Fairbrother or others to see.
 
 
 16
 Forensic Treatment Specialist Ronald Jursch testified that, contrary to Fairbrother's assertion that Fairbrother would make coffee and bring it to the staff, she would make coffee for only one other staff person "and exclude everybody else." Jursch stated that he never called Fairbrother a bitch or a whore, that he never heard anyone else call Fairbrother a "bitch" or "whore," or suggest to her that she wear a French maid outfit. Jursch also asserted that he never saw pornography lying out in the open, and that none of the male employees would talk about their sex lives.
 
 
 17
 Forensic Treatment Specialist Ian Walker testified that he never heard Boisvert call Fairbrother "bitch" or "whore," and never saw pornographic magazines left out in the open, nor did he hear Whiting employees discussing their sex lives. Forensic Treatment Specialist James Young testified that he never heard other employees making sexual comments around Fairbrother, never called her "bitch" or "whore," and never talked about his sex life with his co-workers.
 
 
 18
 Unit One Head Nurse Tammi Brown denied that Colavito ever made the sexual comment about the employee with the ruler. One female Forensic Treatment Specialist denied ever having seen pornography in the bathrooms, on the walls, or lying out in the open. Another testified that in her eighteen years at Whiting, she encountered pornographic magazines only once, and that they were promptly removed.
 
 
 19
 Lieutenant Steven Caron, a police officer at Whiting, testified that he would conduct monthly "environmental rounds" where he and others inspected every room in a unit, including the staff areas. Caron said that he had never seen pornographic materials lying around the staff areas or the staff bathrooms, nor had he seen pornographic material posted on the walls. Caron did acknowledge, however, that another officer had found a Playboy magazine in a staff bathroom in Unit Two in 2000.
 
 
 20
 The defense argued that Fairbrother's motive to lie stemmed from the incident in which Fairbrother is alleged to have assaulted Ian Walker. On February 13, 2000, Young and Walker responded to a call for help in restraining a patient — also known as a "code." Subsequently, they sat together in the staff room and discussed the episode with Brown. Fairbrother was also in the staff room at that time. According to Walker and Brown, while they were discussing the restraint episode, Fairbrother approached Walker and grabbed his groin, saying, in Brown's words, "Well, if I was there, this is what I would have done." Brown stated that Fairbrother then laughed and left the room. Fairbrother described what took place as follows: "[Walker] mentioned another female [Forensic Treatment Specialist] that responded to the code and said something to effect, well, she can't fight, she's useless. And, in turn, I said in a joking manner, Well, you don't have to know how to fight. All you have to do is this." According to Fairbrother, she then moved her hands toward Walker's crotch area, but did not grab him. Her hand "could have brushed his pants, but that was it."
 
 
 21
 Counsel for the defendants argued during his summation that Fairbrother's anger over being disciplined for the incident involving Walker led her to fabricate her sexual harassment claims.
 
 
 22
 Title VII law permits defendants under certain circumstances to avoid liability based on the reasonable care they take to prevent sexual harassment. Although this argument was not a significant component of the defendants' case to the jury, they did introduce evidence at trial that they now argue supports such a defense. The defendants introduced at trial DMHAS's written sexual harassment policy along with flyers and informational materials to assist potential complainants. The policy is laid out in a "Commissioner's Policy Statement" that defines sexual harassment to include, inter alia,"any conduct of a sexual nature when . . . such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." The policy statement specifies that "[a]ll complaints alleging sexual harassment should be made in writing to the facility Affirmative Action Officer or in the absence of a facility Affirmative Action Officer, to the facility Personnel Director, for investigation."
 
 
 23
 Morrison offered examples of how DMHAS responds to sexual harassment complaints. Morrison testified that, upon receiving a complaint concerning obscenities on a kitchen bulletin board, she immediately went to the kitchen in question, and found that the only obscene material had already been removed. After Fairbrother filed her CHRO complaint in May 2000, Morrison "interviewed members of the unit regarding specific allegations which Ms. Fairbrother had made in her complaint." When Morrison received Fairbrother's amended CHRO complaint in October 2000 containing more detailed allegations about pornography on the premises at Whiting, Morrison called the Whiting police and ordered an investigation of the staff areas and bathrooms that turned up no pornography.
 
 
 24
 The defendants argue that Fairbrother failed to take advantage of these resources by failing to notify them in a timely manner of the precise nature of her hostile work environment claims. Davis testified that when Fairbrother first came to him in the fall of 1999, she described only "personality conflicts," identified no specific examples of mistreatment, and stated that "she could work the problems out on the unit." Boisvert stated that she never complained to him about pornography, the French maid outfit, or a sexually hostile work environment. Morrison testified that, other than an April letter from Fairbrother's attorney, to which she responded, "Please give me more details," the first time she heard Fairbrother's allegation that the workplace was permeated with sexually explicit material was when she received the amended CHRO complaint in October of 2000. Morrison also stated that, while the investigation into the incident with Walker was ongoing, Morrison "told [Fairbrother] how to submit any complaints of hostile work environment to me and the Affirmative Action Office, and she did not do so."
 
 
 25
 On the retaliation issue, the defendants put forth evidence justifying the allegedly negative employment consequences that Fairbrother claimed to have suffered after she filed her complaint. Morrison testified that Fairbrother was transferred out of Unit One both because "if the allegations were true, we didn't want her working in an environment where she was continually subjected to those circumstances," and because "[i]f not corroborated, we didn't want more unsubstantiated allegations against any co-workers." The defense attributes Fairbrother's unsatisfactory rating to her behavior during the Ian Walker incident and the resulting fifteen-day suspension. The defendants point out that Fairbrother acknowledged at trial that she had not lost any wages, retirement credits, or benefits, and had been able to pursue and work overtime.
 
 
 C. Procedural History
 
 
 26
 At the end of the four-day trial, the jury on March 17, 2003 returned a unanimous verdict in favor of Fairbrother on both the hostile work environment and retaliation claims. The jury awarded Fairbrother $20,000 to compensate her for her "damages" generally, without designating the damages stemming from her sexually hostile work environment claim and those stemming from her retaliation claim. The defendants subsequently moved for judgment as a matter of law or a new trial. On October 29, 2003, the district court granted the defendants' motion for judgment as a matter of law as to both claims. Fairbrother v. Connecticut, 306 F.Supp.2d 154, 175 (D.Conn.2003). Accordingly, the district court did not rule on the defendants' motion for a new trial. Fairbrother filed this appeal in November 2003.
 
 DISCUSSION
 
 27
 
 A. Legal Standards in Reviewing a Grant of Judgment as a Matter of Law
 
 
 
 28
 Judgment as a matter of law in jury trials is provided for in Federal Rule of Civil Procedure 50. It may be granted against a party with respect to "a claim or defense that cannot . . . be maintained or defeated without a favorable finding" on an issue for which "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). This circuit has stated that judgment as a matter of law "may only be granted if there exists `such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or the evidence in favor of the movant is so overwhelming `that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir.1997) (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir.1994)) (alterations in original). The motion should be granted "only if [the court] can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." Piesco v. Koch, 12 F.3d 332, 343 (2d Cir.1993). The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir.2001) (quoting Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir.1988)).
 
 
 29
 A court of appeals reviews "a district court's grant of a motion for judgment as a matter of law de novo," viewing "the evidence in a light most favorable to the non-movant, granting that party every reasonable inference that the jury might have drawn in its favor." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir.1997).
 
 
 30
 
 B. Judgment as a Matter of Law on Fairbrother's Hostile Work Environment Claim
 
 
 
 Background Law
 
 
 31
 A Title VII hostile work environment claim requires a showing that "the harassment was `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Id. Proving such a claim "involves showing both `objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" Feingold v. New York State, 366 F.3d 138, 150 (2d Cir.2004) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).
 
 
 32
 In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer. "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir.2004). According to two 1998 Supreme Court cases, Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee. Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, "a court looks first to whether the supervisor's behavior `culminate[d] in a tangible employment action' against the employee." Petrosino, 385 F.3d at 225 (quoting Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257) (alteration in original). If it did, "the employer will, ipso facto, be vicariously liable." Mack v. Otis Elevator Co., 326 F.3d 116, 124 (2d Cir.2003). If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. Petrosino, 385 F.3d at 225. That defense requires the employer to show that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257.
 
 
 Analysis
 
 
 33
 The district court concluded that "Fairbrother has failed to provide any substantive evidence that the terms of her employment were altered, that a term, condition, or privilege of her employment was affected, or that anyone unreasonably interfered with her work performance." Fairbrother, 306 F.Supp.2d at 174 (quotation marks omitted) (citing Harris, 510 U.S. at 21, 114 S.Ct. 367, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). In support of this determination, the district court noted that Fairbrother was still employed at Whiting and had lost no compensation or benefits, and further observed that "not one of the 500 employees at Whiting came forward to corroborate Fairbrother's claims." Id. at 174 n. 12. In addition, the district court concluded that Fairbrother had not shown "any reason for imputing the alleged hostile work environment to DMHAS." Id. at 174. Critical to this conclusion was the district court's finding that Fairbrother "never reported her allegations of sexual harassment, permeating pornography, being called a `whore' or a `bitch,' or a sexually hostile environment to anyone, including her supervisors, her co-workers, the Department of Human Resources, the Affirmative Action Office, or anyone in the administration of Whiting or DMHAS." Id. at 174-75 (emphasis in original). Based on these conclusions, the district court found "that Fairbrother's version of the alleged facts is insufficient to permit a reasonable jury to have found that she had been subjected to a sexually hostile work environment." Id. at 175.
 
 
 34
 We note, at the outset, that the district court opinion devoted significant attention to evidence that, if relevant at all, appears to bear primarily on Fairbrother's credibility. The district court delved into testimony suggesting that Fairbrother fabricated a story — unrelated to her hostile work environment claim — about how a patient called her "bitch," id. at 159 n. 3, and observed that Fairbrother initially alleged merely gender-neutral "hostility," and only alleged a sexually hostile work environment after the incident involving Ian Walker. Id. at 157, 174. The district court noted that "[e]very male co-worker who testified was vehement in his denial of any of the misconduct allegedly attributed to him," id. at 170, and discussed at length the defense witnesses' testimony concerning workplace conditions. Id. at 170-72. Fairbrother's failure to allege wrongdoing by her "best friend," Forensic Treatment Specialist David Phelps, id. at 157, and Boisvert's testimony that Fairbrother once gave Phelps a "provocative" massage, id. at 170, were also of interest to the district court. Elsewhere, the district court opinion dwelled on aspects of Fairbrother's competence — such as instances in which she allegedly agitated the patients — that were never asserted as a basis for any adverse action against her. Id. at 158-59.
 
 
 35
 The district court's focus on this evidence, and its ultimate conclusion that "Fairbrother's version of the alleged facts is insufficient to permit a reasonable jury to have found that she had been subjected to a sexually hostile work environment," id. at 175, suggest a determination that a jury could not deem Fairbrother credible. However, a motion for judgment as a matter of law must be considered "with credibility assessments made against the moving party." Piesco v. Koch, 12 F.3d 332, 343 (2d Cir.1993) (emphasis added). Indeed, it is difficult to understand how the district court reached its conclusion without engaging in "`weighing the credibility of the witnesses or otherwise considering the weight of the evidence,'" a task expressly prohibited when considering judgment as a matter of law. Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir.1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)). The district court erred to the extent it determined that Fairbrother's allegations were not to be believed.
 
 
 36
 The district court also erred in determining that Fairbrother "failed to provide any substantive evidence that the terms of her employment were altered." Fairbrother, 306 F.Supp.2d at 174. The district court based this conclusion on Fairbrother's inability to show that she was terminated or lost compensation as a result of sexual harassment. Id. However, it is fundamental to a hostile work environment claim that the terms of the plaintiff's employment are alleged to have been altered not by any change in benefits or employment status, but rather by "`discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive.'" Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir.2004) (quoting Harris, 510 U.S. at 21, 114 S.Ct. 367).
 
 
 37
 Here we believe a jury could reasonably find such severe or pervasive workplace hostility. Fairbrother testified to the following. For a period of several months, she was called "bitch" almost daily, and called "whore" ten to fifteen times. Her male colleagues routinely talked about their sexual activities and asked Fairbrother about hers. She was asked why she was not wearing a French maid outfit. Pornography was left in the staff bathrooms and the staff office where team meetings were held. Her male colleagues would also show her these pornographic materials and ask her impression of them. At any given time, there were at least two or three sexually offensive jokes posted on the staff office bulletin boards. A co-worker once yelled out to another a comment concerning the size of the other worker's private parts. When she complained about the pornography, her supervisor told her "you're not going to prevent me from . . . running the unit the way I want to run it." Moreover, these events made Fairbrother and her patients "anxious," thereby creating a potentially dangerous work environment.
 
 
 38
 These circumstances are egregious enough to permit a reasonable juror to conclude that the conditions of Fairbrother's employment were altered because the hostile work environment she faced undermined her ability to perform her job. See Dawson, 373 F.3d at 274 (2d Cir.2004) (stating that the "crucial question" in a hostile work environment case is "whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs"); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000) (rejecting district court's test of whether plaintiff's circumstances were "unendurable" or "intolerable" and stating "the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse" (quotation marks omitted)). Certainly, the circumstances alleged by Fairbrother are consistent with — indeed, similar to — circumstances in cases where this court has vacated grants of summary judgment or judgment as a matter of law in the past. In Dawson, we vacated a grant of summary judgment in favor of the defendants on a hostile work environment claim based on demeaning materials and comments in a prison environment. Dawson, 373 F.3d at 267. We held that a hostile work environment could be found to exist where two letters drafted by prison inmates containing sexually explicit references to female corrections officers were disseminated by male officers, who subjected female officers to inappropriate comments stemming from the letters. Id. at 268-70. In Whidbee, we vacated a grant of summary judgment on a hostile work environment claim where employees at a restaurant were subjected to racially offensive comments during a three-month period. Whidbee, 223 F.3d at 66-67. In Leopold v. Baccarat, Inc., 174 F.3d 261 (2d Cir.1999) (hereinafter "Leopold I"), we reversed a grant of judgment as a matter of law on a hostile work environment claim where the plaintiff's supervisor had made several derogatory comments with sexual overtones.[5] Id. at 264-65. The treatment alleged here is comparable in its intimidating and belittling quality.
 
 
 39
 DMHAS argues the opposite: that courts have upheld the dismissal of hostile work environment claims based on incidents that were equally or more offensive than those recounted by Fairbrother. DMHAS cites only one Second Circuit case in support of this assertion, Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir.1998). However, that case involved only two actionable incidents of alleged hostile treatment: a comment about the plaintiff's body, and brushing the plaintiff's breasts with some papers. Id. at 768. The court determined that those two events were "sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded Quinn's work environment." Id. Quinn is clearly inapposite, because Fairbrother has alleged significantly more sustained and enduring patterns of hostile conduct, which, if true, could be found to have permeated her work environment.
 
 
 40
 For all the aforementioned reasons, we thus conclude that Fairbrother's allegations sufficed to permit a reasonable juror to determine that her conditions of employment were altered.
 
 
 41
 The district court apparently rendered an alternative ruling that, even if the sexually explicit material and behavior confronting Fairbrother did alter the conditions of her employment, the defendants were still entitled to judgment as a matter of law because no specific basis existed for imputing the objectionable conduct to the employer. We respectfully disagree.
 
 
 42
 As noted supra, a plaintiff can impute conduct that creates a hostile work environment to the employer in different ways depending on whether the conduct was carried out by the plaintiff's supervisor or by non-supervisory co-workers. Here, if Fairbrother's testimony was to be believed, the harassment was created by both her co-workers and her supervisor. Under such circumstances, courts analyze whether employer liability can be established under either test. See Haugerud v. Amery Sch. Dist., 259 F.3d 678, 696-700 (7th Cir.2001); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 875-77 (9th Cir.2001).
 
 
 43
 To establish employer liability for the role her co-workers played in creating a hostile work environment, Fairbrother must show "that the employer `failed to provide a reasonable avenue for complaint or . . . knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir.2000) (quoting Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir.1999)). Fairbrother testified that on multiple occasions, she complained to different officials at Whiting about her treatment. Initially, she complained to Boisvert, her supervisor, telling him "about materials and talk on the unit." In November 1999, she complained to Davis, her Nurse Supervisor, about the sexually hostile work environment she was facing, providing him with specific examples of "what was going on." She testified that she informed Morrison, whom she identified as a Personnel Director, of the "[h]ostilities, the magazines, the name calling, the accusations," in a conversation before the prediscipline hearing on May 9, 2000. In addition, Fairbrother testified that, in a meeting in which Morrison wished to discuss the Ian Walker incident — the investigation of which was commenced in late February or early March — Fairbrother "discussed everything, the whole situation." According to Fairbrother, none of these complaints spurred meaningful action by her employer, other than a series of staff meetings that were delayed by several months and that ultimately were not at all constructive or remedial. To be sure, Boisvert, Davis, and Morrison all denied that Fairbrother had put them on notice of her hostile work environment claims. However, if a juror credited Fairbrother's testimony over theirs, that juror could have reasonably determined that DMHAS, in the exercise of reasonable care, knew or should have known about the co-worker harassment faced by Fairbrother, yet failed to take appropriate remedial action.
 
 
 44
 There was also reason for the jury to impute liability based on the participation of Fairbrother's supervisor. Fairbrother claimed that Boisvert created the hostile work environment, testifying that he called her "whore" and "bitch," would not answer her questions or give her phone messages when people called, insisted in her presence that she be removed from the unit, and instigated the hostile conduct toward her generally. An employer is presumptively liable for a hostile work environment created by a supervisor. See Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257; Leopold v. Baccarat, 239 F.3d 243, 245 (2d Cir.2001) (hereinafter "Leopold II"). However, if the employer takes no tangible employment action in connection with the harassment, the employer has available an affirmative defense.[6] See Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257; Leopold II, 239 F.3d at 245. Again, that "defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257.
 
 
 45
 This aspect of the Burlington Industries/Faragher analysis is an affirmative defense on which the employer bears the burden of proof. See Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir.2001). A party faces a significantly heightened standard to obtain judgment as a matter of law on an issue as to which that party bears the burden of proof. "It is rare that the party having the burden of proof on an issue at trial is entitled to a directed verdict." Granite Computer Leasing Corp. v. Travelers Indem. Co., 894 F.2d 547, 551 (2d Cir.1990). Indeed, "[a] verdict should be directed in such instances only if the evidence in favor of the movant is so overwhelming that the jury could rationally reach no other result." Id.See also Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 109 (2d Cir.2001); 9 Moore's Federal Practice § 50.05 (2004) ("[G]ranting judgment as a matter of law for a party who bears the burden of proof is an extreme step that may be taken only when the evidence favoring the movant is so one-sided that, absent adequate evidentiary response by the nonmovant, it could not be disbelieved by a reasonable jury.").
 
 
 46
 The defendants clearly failed to attain this high standard on the second component of the affirmative defense, which requires demonstrating "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257. Again, DMHAS's written policy stated that an employee was to contact an Affirmative Action Officer or a Personnel Director at the "facility" — i.e., at Whiting.
 
 
 47
 Because the defendants bore the burden of proof on this issue, at the very least, DMHAS would have had to identify all of the Affirmative Action Officers and Personnel Directors to whom Fairbrother might have complained, and show conclusively that she did not. See Leopold II, 239 F.3d at 246 (stating that to obtain summary judgment based on the Burlington Industries/Faragher affirmative defense, a defendant must "satisf[y] its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure"). This they did not do. The defendants introduced no affirmative evidence that Fairbrother failed to complain to an Affirmative Action Officer. Presumably, such evidence would have been available, in the form of that office's records, or the testimony of the Affirmative Action Officers to whom Fairbrother might have complained. Fairbrother herself acknowledged that she did not complain to the Affirmative Action Office in November 1999, testifying that at that time, she wanted to "maintain it on the unit." She also acknowledged that she did not file any "formal complaints" prior to the incident involving Ian Walker, which took place in mid-February 2000. This, of course, leaves open the possibility that she filed a "formal complaint" after mid-February 2000 and before mid-May 2000, when she filed her complaint with the Connecticut Commission on Human Rights & Opportunities. Fairbrother's testimony also does not foreclose the possibility that she put a Personnel Director or an Affirmative Action Officer on notice of her claims through informal conversations, such as the ones she had with Morrison.
 
 
 48
 The defendants did offer the testimony of Morrison, a Personnel Director. When Morrison was asked whether Fairbrother's October complaint was the first mention of "magazines and a hostile work environment," Morrison responded, "Yes, it is," and she gave similar testimony in response to other questions. Morrison testified that, other than an April letter from Fairbrother's attorney, the first time she "heard Ms. Fairbrother's allegation that the workplace was permeated with sexually-explicit material" was when she received "the amended CHRO complaint in October of 2000." Morrison also stated that, while the investigation into the incident involving Walker was ongoing, Morrison "told [Fairbrother] how to submit any complaints of hostile work environment to me and the Affirmative Action Office, and she did not do so." The defendants did not establish how Morrison, a Personnel Director and apparently not part of the Affirmative Action Office, would have personal knowledge concerning whether or not Fairbrother filed a complaint there.
 
 
 49
 Even if we were to overlook the defendants' failure to establish that Fairbrother never complained to an Affirmative Action Officer, and if we were to conclude that Morrison was the only Personnel Director to whom Fairbrother was supposed to complain, we would have to accept the possibility that the jury could have simply disbelieved Morrison, a defendant in this action. Essentially, we would be left with Morrison's testimony that Fairbrother did not inform her of a hostile work environment before October 2000 against Fairbrother's testimony that she did. We cannot conclude on this record that the defendants' evidence is so "overwhelming" that the jury could rationally reach no other result. Granite Computer, 894 F.2d at 551. To do so would necessarily entail weighing the credibility of the witnesses, something we are expressly prohibited from doing on judgment as a matter of law. Cruz, 34 F.3d at 1155. For these reasons, the district court was mistaken to the extent it relied on the Burlington Industries/Faragher affirmative defense to conclude that liability could not be imputed to DMHAS for the hostile work environment created by Boisvert.
 
 
 50
 We note that the incompleteness of the defendants' evidence that Fairbrother failed to put her employer on notice of sexual harassment is not surprising, given that this argument was not the thrust of the defendants' case. Their primary argument, as evidenced by their choice of witnesses and their summation to the jury, was that Fairbrother was fabricating the events constituting her hostile work environment claim. Only now that the jury has clearly rejected that argument do they seriously press their claim that liability should not be imputed to DMHAS.[7] However, they have simply failed to identify the evidence necessary to sustain judgment as a matter of law on this issue, one as to which they bear the burden of proof.
 
 
 51
 For these reasons, judgment as a matter of law in favor of the defendants on the issue of a sexually hostile work environment was not appropriate, and we reverse this aspect of the district court's ruling.
 
 
 52
 On remand, the district court may consider whether to grant the defendant's motion for a new trial on the hostile work environment claim under Fed.R.Civ.P. 59(a). See Otero v. Bridgeport Hous. Auth., 297 F.3d 142, 154 (2d Cir.2002); United States v. Landau, 155 F.3d 93, 104 (2d Cir.1998).
 
 
 53
 
 C. Judgment as a Matter of Law on Fairbrother's Retaliation Claim
 
 
 
 54
 The district court also granted judgment as a matter of law to the defendants on Fairbrother's retaliation claim, concluding that the evidence did not support a finding of an adverse employment action.[8] Fairbrother, 306 F.Supp.2d at 166.
 
 
 55
 An adverse employment action is a "`materially adverse change' in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir.2004) (quoting Richardson, 180 F.3d at 446). We have stated that such an action "is one which is `more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir.2003) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000)). "Examples of materially adverse changes include `termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Galabya, 202 F.3d at 640).
 
 
 56
 After she filed a discrimination complaint in May 2000, Fairbrother was transferred out of Unit One, and given "float[ing]" responsibilities in all the other units. Her work as a floater did not involve any material difference from her work in Unit One. Although she was prohibited from entering Unit One — a measure that seems a reasonable response to her complaint of sexual harassment in that unit — this only required her to walk a short distance out of her way occasionally. Moreover, Fairbrother acknowledges that she did not lose wages, retirement credits, benefits, or overtime opportunities due to this transfer. Without a real change in the conditions of employment, a transfer is only "a mere inconvenience or an alteration of job responsibilities," and hence not "materially adverse." Galabya, 202 F.3d at 640. Fairbrother testified that she suffered emotional losses due to this shift. However, "`[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.'" Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir.2004) (quoting Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532-33 n. 6 (10th Cir.1998)) (alterations in original).
 
 
 57
 The department initially contested Fairbrother's application for worker's compensation due to a back injury. However, her claim was eventually paid. Thus, the department's handling of her application was not a material loss of benefits.
 
 
 58
 In September 2000, Fairbrother received an appraisal with an overall rating of "Unsatisfactory." This evaluation was followed by a positive evaluation the next year, and Fairbrother does not assert that the "unsatisfactory" evaluation negatively altered her compensation, benefits, or job title. In Weeks v. New York State Division of Parole, 273 F.3d 76 (2d Cir.2001), this court held that a notice informing an employee of incompetence and a "counseling memo" concerning the employee's conduct, without any allegation of negative ramifications for the plaintiff's job conditions, could not constitute an adverse employment action. Id. at 86. The court explained that "a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." Id. Similarly, in Jenkins v. Board of Education, 64 Fed.Appx. 801 (2d Cir.2003), this court rejected a claim of an adverse employment action based on an "unsatisfactory" evaluation that was either threatened or actually received, because "there is no evidence that Plaintiff-Appellant suffered a diminution in salary or benefits." Id. at 804. See also Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 756 (2d Cir.2004) (holding that jury could reasonably find that a negative evaluation was not an adverse employment action where plaintiff had offered no proof that the "evaluation had any effect on the terms and conditions of her employment"); Richardson, 180 F.3d at 443-44 (rejecting claim of adverse employment action based on two reviews that characterized the plaintiff's performance as "average" rather than "excellent").
 
 
 59
 In response, Fairbrother relies primarily on Treglia v. Town of Manlius, 313 F.3d 713 (2d Cir.2002), in which the plaintiff had received a negative performance evaluation, and this court vacated the district court's grant of summary judgment to the defendant on the plaintiff's retaliation claim. Id. at 717, 724. In that case, the negative employment evaluation was part of a panoply of evidence that the plaintiff suffered truly adverse consequences, including three internal investigations, an involuntary transfer to an administrative, non-enforcement position, assignment to front-desk responsibilities full-time, assignment to the night shift in front of less senior officers, involuntary placement on disability leave, and being passed over for promotion to sergeant in favor of an officer with lower exam scores. Id. at 717-18. Consequently, Treglia does not afford a sufficient basis for Fairbrother's contention that the September 2000 evaluation constituted an adverse employment action.
 
 
 60
 Thus, we conclude that the September 2000 evaluation does not support her claim of an adverse employment action.
 
 
 61
 For all of these reasons, there is no legally sufficient evidentiary basis for a reasonable jury to find for Fairbrother on the issue of an adverse employment action.[9] The district court thus properly granted judgment as a matter of law to the defendants on Fairbrother's retaliation claim.
 
 
 D. The Damages Award
 
 
 62
 The jury awarded Fairbrother $20,000 in damages in response to an interrogatory that asked, "What amount of money do you award Ms. Fairbrother to compensate her for her damages?". In supplemental briefing to this court, the parties outlined their views concerning how to allocate this award if the district court's judgment were reversed on one claim but not the other. Fairbrother argues that she should be awarded the full $20,000, pointing out that the defendants consented to a general verdict form that did not ask the jury to specify what portion of the damages is attributable to each claim. She asserts that this court should not speculate as to the jury's thinking, and instead rely on what we know with certainty, which is that "the jury believed plaintiff-appellant suffered damages in the amount of $20,000." DMHAS responds that we should reduce the damage award to $10,000. They point out that the jury specifically answered "Yes" to two separate questions, one asking whether Fairbrother was harmed due to a hostile work environment, and the other whether she was harmed due to retaliation.
 
 
 63
 The parties have not pointed out any trial testimony or documentary evidence regarding the amount of Fairbrother's damages stemming from either claim. In closing arguments to the jury, the only mention of damages came from Fairbrother's attorney, who initially commented that, "[t]his isn't a case about money." A final comment by her attorney arguably suggests that Fairbrother asked for damages based only on the hostile work environment claim: "We're not asking for $1 million. $1 million is not appropriate, but some compensation for having to put up with the sexual, the inappropriate work environment, for suffering through three years where this stigma is still attached to her."
 
 
 64
 Our conclusion that Fairbrother suffered no adverse employment action might weigh in favor of concluding that nearly all of the award should be associated with the hostile work environment claim. For all the reasons discussed supra, we believe it would have been difficult for the jury to conclude that any action taken against Fairbrother in retaliation for her protected activity caused her significant harm. Consequently, a reasonable reading of the jury's verdict might be to assume that nearly all of the $20,000 in awarded damages is attributable to the hostile work environment claim.
 
 
 65
 However, given the paltry record concerning damages, and the fact that the district court has not yet ruled on this issue, we conclude that the prudent course is to follow "[t]he general rule in our circuit . . . that `a federal appellate court does not consider an issue not passed upon below.'" United States v. Collado, 348 F.3d 323, 328 (2d Cir.2003) (quoting Robinson v. Gov't of Malaysia, 269 F.3d 133, 147 (2d Cir.2001)). We decline to rule on this issue, and instruct the district court to consider it on remand.
 
 CONCLUSION
 
 66
 Accordingly, that portion of the district court's order dated October 29, 2003 granting the defendants judgment as a matter of law on Fairbrother's sexually hostile work environment claim is REVERSED. That portion of the order granting the defendants judgment as a matter of law on Fairbrother's retaliation claim is AFFIRMED. The case is remanded for further proceedings consistent with this opinion, including a determination by the district court on the issue of damages, and resolution of the defendant's motion for a new trial on the hostile work environment claim under Fed.R.Civ.P. 59(a), if the defendants choose to renew that motion.
 
 
 
 Notes:
 
 
 [1]
 Under Whiting's organization, Forensic Treatment Specialists reported to a lead Forensic Treatment Specialist for the unit, the lead Forensic Treatment Specialist reported to a Head Nurse, and the Head Nurse reported to a Nurse Supervisor
 
 
 [2]
 Although Fairbrother testified that she felt generalized "hostility" from Unit One's male employees as soon as she began working there, her situation became more uncomfortable after the fall of 1999
 
 
 [3]
 See infra.
 
 
 [4]
 This hearing is also referred to in the record as aLoudermill hearing. Such a hearing is held to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
 
 
 [5]
 InLeopold I, the evidence of a hostile work environment consisted entirely of the plaintiff's own testimony that her supervisor repeatedly threatened to fire saleswomen and replace them with "young and sexy" hires, once told saleswomen that they were "nothing but a bunch of pussies," stated that he "love[d] it when women fight," told the plaintiff that she was in "good shape" given her age, and commented that one of the plaintiff's co-workers was successful because she flirted with male customers. Leopold I, 174 F.3d at 265-66.
 
 
 [6]
 In our discussion of Fairbrother's retaliation claim, we conclude that she failed as a matter of law to show an adverse employment action sufficient to sustain that claimSee infra. We need not and do not decide, however, whether a "tangible employment action" under Burlington Industries and Faragher is different from an "adverse employment action" as that term is understood in the employment discrimination case law. Because we reject the defendants' Burlington Industries/Faragher affirmative defense on other grounds, we assume for purposes of our analysis that the defendants took no tangible employment action against Fairbrother.
 
 
 [7]
 Indeed, the defendants placed such a low priority on this argument that they failed to insure that the district court gave the jury proper instructions concerning theBurlington Industries/Faragher defense. The district court instructed the jury that "an employer is presumed absolutely liable when the harasser is the victim's supervisor," but did not instruct the jury that under such circumstances, if the employer takes no tangible employment action in connection with the harassment, the employer has available an affirmative defense based on the reasonable care taken to prevent harassment and the plaintiff's unreasonable failure to take advantage of such measures. See Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257. At oral argument, counsel for DMHAS acknowledged that the jury instructions did not explain the Burlington Industries/Faragher affirmative defense, and acknowledged that he "probably" did not object to this omission. We see no evidence in the record that the defendants made such an objection. Essentially, the defendants, having failed to give the jury the opportunity to grant them a verdict based on this affirmative defense, ask the courts to rectify their error. Particularly in light of the incompleteness of the evidence they offer on this issue, we cannot grant them this relief.
 
 
 [8]
 The district court's opinion stated that the lack of an adverse employment action meant that Fairbrother had not made out a "prima facie case" of discriminationFairbrother, 306 F.Supp.2d at 166. However, Supreme Court and Second Circuit case law make clear that once a Title VII case has been "fully tried on the merits, [a court] need not determine whether [the plaintiff] established a prima facie case." Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir.1999). Coffey relied on United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), in which the Supreme Court stated that once a case is tried on the merits, "the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case," and consequently, "whether the plaintiff really did so is no longer relevant." Id. at 715, 103 S.Ct. 1478. However, in addition to being a requirement of a prima facie case, an adverse employment action is a necessary component of any claim of retaliatory discrimination. See Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 85 (2d Cir.2001) ("An adverse employment action is a requisite of a claim alleging disparate treatment or retaliation."); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980). For this reason, we analyze whether the district court was correct when it concluded that the evidence did not support finding an adverse employment action.
 
 
 [9]
 We note that Fairbrother waived any claim that her fifteen-day suspension without pay as punishment for the Ian Walker incident was an adverse employment action. Fairbrother apparently did not object to the district court's instruction to the jury that she "is not alleging that her suspension was an adverse employment action." Moreover, Fairbrother's attorney stated during summation to the jury. "When Greta went to her Loudermill hearing, Greta admitted and she never denied that her conduct was inappropriate. We're not contesting the 15-day suspension. We're not asking you to award damages for the 15-day suspension. . . ."