NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0842n.06

No. 12-6197

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Sep 19, 2013

DEBORAH S. HUNT, Clerk

STEPHANIE WILLIAMS,                            )
                                               )      ON APPEAL FROM THE
        *Plaintiff-Appellant*,                 )      UNITED STATES DISTRICT
                                               )      COURT FOR THE WESTERN
v.                                             )      DISTRICT OF TENNESSEE
                                               )
CSX TRANSPORTATION COMPANY, INC.               )      **O P I N I O N**
                                               )
        *Defendant-Appellee*.                  )

BEFORE:     SILER and COLE, Circuit Judges; DOWD, District Judge.[*]

        PER CURIAM.  Plaintiff-Appellant Stephanie Williams is suing her employer, Defendant-Appellee CSX Transportation Company, Inc. ("CSX"), under Title VII for subjecting her to a sexually hostile work environment.   Williams alleges that she was treated differently from male employees, confronted on one occasion with racist and sexist remarks by CSX employee Jeff Wingo, and continually exposed to pornography left out in the open in her workplace.  The district court excluded Williams's pornography allegations from its analysis on the grounds that they were insufficiently related to her EEOC filings, and found no evidence to indicate that Williams's alleged adverse treatment was based on sex, except for the confrontation with Wingo.  The district court granted summary judgment to CSX on the ground that the single confrontation with Wingo was

---

        [*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

neither severe nor pervasive enough to constitute a sexually hostile environment. Williams appeals.

We affirm on an alternate ground supported by the record.

I.

We laid out most of the relevant facts in *Williams v. CSX Transportation Co., Inc.*, 643 F.3d

502 (6th Cir. 2011) (*Williams I*):

> Stephanie Williams began working as a clerk for CSX at its Bruceton, Tennessee, facility in April 2002 . . . . Clerks' duties include, among other things, performing janitorial work . . . . Among her coworkers and supervisors at the Bruceton facility, Williams was the only black employee and the only female employee.

> Williams alleges that, between 2002 and 2004, her supervisors treated her differently than her white male counterparts. First, she asserts that Ed Anderson, a supervisor, required her once to clean feces off the walls of a restroom and out of a urinal, and that her white male counterparts never had to complete such a task. Second, Williams alleges that Anderson ordered her on four separate occasions to strip the restroom floor using an inappropriate tool. Williams requested a power tool from Anderson, who told her it was not in the budget. A different supervisor, Tim Magargle, once permitted a white male clerk to rent a power tool to complete the same task. Third, Williams alleges that Anderson refused to reimburse her for the mileage expense of driving her personal vehicle twice weekly during 2003 from Bruceton to New Johnsonville, Tennessee—even though corporate policy was to reimburse such mileage and the white male employees in her office received reimbursement. Fourth, Williams asserts that her car was vandalized: the right exterior was "keyed," and the tires on the same wheel were punctured five successive times, resulting in five flat tires.

> In addition to these incidents, Williams alleges that a single racist and sexist confrontation occurred at the CSX Bruceton facility. According to Williams, Jeff Wingo and Tim Magargle, two supervisors, were watching the Republican National Convention on television on the evening of September 2, 2004 when Williams entered and indicated she did not want to watch. Wingo allegedly told Williams that she was a Democrat only because she was a black woman; that unmarried women cannot "have the love of God in their heart[s]"; and that this country should "get rid of" Jesse Jackson and Al Sharpton because without those two "monkeys" the country "would be a whole lot better." The following day, Williams alleges that Wingo told

her that if she returned to school, she would not have to pay for her education because she was a single black mother. . . .

Williams also alleges that Wingo made two racist statements in passing to her between one to six months before the confrontation. Wingo once asked Williams why black people cannot name their children "stuff that people can pronounce, like John or Sue." He also told Williams that black people should "go back to where [they] came from." . . . . Williams does not allege that any of her coworkers or supervisors other than Wingo ever made a single sexist or racist remark.

*Id.* at 505-06. Also, Williams's co-workers kept pornography magazines at work, which they

sometimes left in plain view on tables and in an unlocked locker.

Two months after the Wingo incident, on November 9, 2004, Williams lost her job at the Bruceton facility. . . . First, CSX eliminated the position of another one of the Bruceton clerks. That clerk then exercised his right under CSX policy to displace a more junior employee at the Bruceton facility, and that more junior employee in turn exercised his right to displace Williams—who had the shortest tenure of the four Bruceton clerks. After this occurred, Williams exercised her own displacement right to obtain a clerical position at CSX's Nashville facility.

*Id.* at 506.

After Williams lost her job at Bruceton, she filed a "Charge Information Form" with the

EEOC:

In that filing . . . Williams recounted the Wingo incident in detail. She alleged that the elimination of the other clerk's position, which led to her dislocation to the Nashville facility, was in retaliation against her for the anonymous call to the CSX ethics hotline reporting the Wingo incident. She also alleged, independently, that her dislocation to the Nashville facility was an act of discrimination based on her race and sex.

*Id.* She also wrote: "It is a very hostile work environment. If my supervisors had properly done their

jobs . . . , I could have worked [at Bruceton]." Then, the EEOC completed a second filing on

Williams's behalf, a "Charge of Discrimination":

The general thrust was that discrimination and retaliation caused Williams's dislocation to the Nashville facility. The allegations mentioned neither Wingo's conduct nor any other indication of a hostile work environment; however, the second sentence stated that Williams was "subjected to unequal terms and conditions of [her] employment." Within a field entitled "discrimination based on," three boxes were marked: "race," "sex," and "retaliation." Within a field entitled "date(s) discrimination took place," the "earliest" date listed was September 2, 2004 (the date of the Wingo incident). Immediately below, the box indicating that the discrimination was a "continuing action" was marked.

*Id.* at 506-07. Neither of the filings mentioned pornography:

Williams sued CSX in federal district court for discrimination, retaliation, and both sexually and racially hostile work environments. The district court granted summary judgment to CSX [on Williams's discrimination and retaliation claims] . . . Williams does not appeal the disposition of those claims. . . .

As to her claim of a sexually hostile work environment, the district court granted summary judgment to CSX on the theory that Williams failed to exhaust her administrative remedies: she did not file a "charge" containing sufficient allegations of a hostile work environment. As to her claim of a racially hostile work environment (which did not require exhaustion), the district court permitted Williams to proceed to trial. At the close of Williams's case in chief, however, the district court granted judgment as a matter of law to CSX. The district court believed that Williams's evidence of a racially hostile work environment was not sufficiently "severe or pervasive" to create a jury question on that claim.

*Id.* at 507.

Williams appealed the district court's judgments in favor of CSX on her sexually hostile work environment claim ("sex claim") and her racially hostile work environment claim ("race claim"), and this Court reversed in part. In *Williams I*, this Court held that the district court (1) did not err in granting judgment as a matter of law on Williams's race claim because no reasonable jury could find that any of the adverse treatment that Williams faced—except for Wingo's statements—was race-based, *see id.* at 512; and (2) erred in granting summary judgment on

Williams's sex claim because Williams had *not* failed to exhaust her administrative remedies, *id.* at 510.

On remand, the district court once again granted summary judgment to CSX on Williams's sex claim. First, the district court excluded the workplace pornography from consideration on the grounds that it was "unconnected to the claims stated in her EEOC forms." Then, the district court found that there was no genuine issue of material fact as to whether CSX created a sexually hostile work environment because (1) Wingo's conduct was not pervasive or severe enough and (2) no reasonable jury could find that Williams's other examples of adverse treatment were based on her sex.

## II.

Williams raises two claims on appeal: (1) the district court erred in excluding her allegations regarding pornography from the summary judgment analysis; and (2) given the adverse treatment Williams allegedly suffered, the workplace pornography and Wingo's statements, a reasonable jury could find that Williams was subjected to a sexually hostile work environment and therefore the district court erred in granting summary judgment to CSX. We do not reach the first question, because even with the pornography allegations included in the analysis, no reasonable jury could find that the conduct alleged by Williams was sufficiently severe or pervasive to support her sexually hostile environment claim.

We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the non-moving party. *See Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1193 (6th Cir. 1995).

To make out a prima facie claim of sexually hostile work environment under Title VII, a plaintiff must show by a preponderance of the evidence: "(1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (citation omitted). To meet the fourth requirement, the harassing conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).

Conduct need not be both severe *and* pervasive to constitute a hostile environment, but may be either sufficiently severe or sufficiently pervasive. *See Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 n.2 (6th Cir. 2012). Comments and conduct need not be directed at the plaintiff to be sufficiently severe or pervasive to constitute a hostile environment. *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). However, where the court finds that comments were not directed at the plaintiff, it weighs against a finding of an objectively hostile environment. *See id.* ("[T]his fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment.").

A district court must consider "harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). This includes "all incidents of alleged harassment" regardless of whether the harasser is an employee or a co-worker. *See id.* at 562-63. Only when determining employer liability, the fifth element of the prima facie case, may the court "conduct separate analyses based on the identity of the harasser." *Id.*

We consider only the pornography and the single confrontation with Wingo as sex-based adverse conduct suffered by Williams. Although Williams alleges additional instances of mistreatment, we are bound by the analysis of the *Williams I* panel, which determined that no reasonable jury could find that race motivated Williams's allegedly disparate cleaning duties, lack of mileage reimbursement, and car vandalism. *See Williams I*, 643 F.3d at 511-12. Williams presents no more direct evidence that these acts were sex-based than she did to show that they were race-based. Therefore, we consider only the pornography and the confrontation with Wingo in determining whether a reasonable jury could find that Williams objectively faced a sexually hostile environment at Bruceton.

Although it is true that "pornography displayed in the workplace, even if not directed to one individual specifically, may contribute to a hostile work environment for women generally," *Avery v. IdleAire Tech. Corp.*, No. 3:04-CV-312, 2007 WL 1574269, at *17 (E.D. Tenn. May 29, 2007), all of the cases Williams cites in which courts have found a genuine question of material fact as to sexually hostile environment feature not only sometimes-visible pornography in the workplace, but additional conduct more severe or pervasive than in the present case. *See id.*, at *4-6 (in addition

to pornography pop-ups on computer that plaintiff occasionally had to use, male employees were encouraged to make inappropriate comments about women, management referred to the plaintiff as a "bitch," plaintiff was told she could earn more money by being a prostitute than at her job, plaintiff was called a slut, plaintiff's hair and nails were mocked); *Andrews v. City of Phila.*, 895 F.2d 1469, 1472-75 (3d Cir. 1990) (in addition to pornography left in view, "women regularly were referred to in an offensive and obscene manner, [both plaintiffs] personally were addressed by the obscenities," one plaintiff was subjected to heavy breathing "down her neck" and pornography left in her personal desk drawer, while the other received repeated propositions); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1498 (M.D. Fla. 1991) (in addition to pornography being visible, plaintiff frequently witnessed obscene conversation about the pornography and plaintiff personally was subjected to sexual remarks from several co-workers, as well as "particularly severe verbal harassment" from another co-worker "regularly" and over "a number of different nights"); *Ayres v. Brewer Co.*, No. 1:04-cv-512, 2006 WL 2092559, at *1 (S.D. Ohio July 26, 2006) (pornography in work trucks was but one of many allegations, others included sex-based insults directed at women in general by multiple employees, plaintiff called "cupcake" and "sweetheart," asked if she "spit[s] or swallow[s]," told that co-worker could keep her happy sexually); *Bell v. Best Brands, Inc.*, No. 3:04-cv-0816, 2005 WL 2177007, at *10 (M.D. Tenn. Sept. 8, 2005) ("workplace . . . was replete with instances of pornographic videos being shown; explicit discussions of sexual activities; and the utilization of vulgar, sexually charged language containing sexual innuendos, among other things," and some of the sexual comments were directed specifically to plaintiff). Williams has not cited any

case in which the mere presence of visible pornography in the workplace combined with a single confrontation involving sexist remarks constituted a sexually hostile work environment.

In *Black*, this Court reversed a jury verdict on the grounds that the alleged conduct was insufficiently severe or pervasive. *See* 104 F.3d at 827. In that case, there were a number of incidents over a four-month period involving several employees: repeated sexual jokes; looking plaintiff up and down, smiling and stating, "Nothing I like more in the morning than sticky buns"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it" about a female official; telling plaintiff she was "paid great money for a woman" when she inquired about her compensation; making a sexual joke during plaintiff's presentation regarding a land purchase; making sexually harassing comments at "many" meetings at which plaintiff was present. *See id.* at 823-24. In this case, on the other hand, the pornography was visible but not directed at Williams, she does not allege that any graphic conversations took place at Bruceton (whether towards her or merely in her presence), and the only sex-based remarks directed at her were made by one co-worker, Wingo, in a single incident. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009) (issue of fact existed as to whether environment was objectively hostile where, in addition to pornography in the workplace, co-workers explicitly discussed pornography and their own sexual exploits, routinely described women as "bitches," "whores," "sluts," "dykes," and "cunts," and called the plaintiff a "bitch" and a "heifer" with "udders"); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 804 (11th Cir. 2010) (en banc) (in addition to pornography, co-workers constantly listened to radio shows with crude gender specific language and graphic discussions about women, and co-workers regularly

sang songs about gender-derogatory topics); *E.E.O.C. v. Central Wholesalers, Inc.*, 573 F.3d 167, 170-73 (4th Cir. 2009) (three employees regularly referred to women as "bitches," one called plaintiff a "bitch" repeatedly during one incident, co-worker in next cubicle watched pornography with audio so that plaintiff was forced to listen, co-worker physically threatened plaintiff); *Fairbrother v. Morrison*, 412 F.3d 39, 44 (2d Cir. 2005), *abrogated on other grounds,* 461 F.3d 199 (2d Cir. 2006) (male co-workers repeatedly showed plaintiff pornography and asked her impression, posted sexually explicit jokes on the bulletin board, asked the plaintiff where her "French maid outfit" was, talked about their sex lives, asked the plaintiff about her sexual practices, "often" called her a "bitch" and a "whore").

Williams's allegations of sex-based harassment—the Wingo incident and the visible pornography—fail to create a genuine dispute of material fact as to whether there was an objectively sexually hostile environment at Bruceton. Therefore, the district court did not err in granting summary judgment.

III.

For these reasons, we affirm the judgment of the district court.

DOWD, District Judge, concurring. Because I am bound by the decision of *Williams I*, even though I am of the view that *Williams I* was wrongfully decided, I concur with the panel's decision.